In re CAROLINA UTILITIES SUPPLY COMPANY, INC., Debtor.

**Bankruptcy No. 90–00677.**

United States Bankruptcy Court, D. South Carolina.

April 13, 1990.

Tony R. Megna, Columbia, S.C., for debtor.

First Factors Corp., Sherwood M. Cleveland, Columbia, S.C., for creditor.

## ORDER

WILLIAM THURMOND BISHOP, Bankruptcy Judge.

Before the court is the debtor's motion to use cash collateral pursuant to 11 U.S.C. § 363.[1] First Factors Corporation ("First Factors" or "the Bank") objects and contends that the financing arrangement between First Factors and the debtor under their "Factoring Contract and Security Agreement" was a factoring agreement ("sale") as to specific accounts or invoices rather than a loan secured by these accounts. First Factors also asserts that since it purportedly purchased and acquired the debtor's accounts receivable, collections on such accounts receivable are not property of the estate under § 541 of the Bankruptcy Code. Further, if the Court finds that the proceeds of such accounts receivable are property of the estate, First Factors submits that it is not possible for the Court to provide it with adequate protection under § 361.

## FINDINGS OF FACT

1. On June 3, 1988, the debtor and the bank entered into an agreement entitled "Factoring Contract and Security Agreement". The agreement was guaranteed by a number of the shareholders of the debtor pursuant to certain personal guarantees attached to the agreement.

2. At the March 22, 1990 hearing, Douglas H. Rogers Vice President of First Factors, testified as follows:

a. The Bank claims an ownership interest in all prepetition accounts receivable of the debtor purchased by the bank.

b. The Bank retains full recourse against the debtor on the accounts.

---

1. Further references to the Bankruptcy Code (11 U.S.C. §§ 101 et seq.) shall be by section number only.

c. The Bank is owed approximately $280,000.00, and has a valid security interest in receivables of the debtor totalling approximately $800,000.00.

d. When an invoice from the debtor is "assigned" to the Bank, the Bank does not pay the debtor anything for the invoice. Instead, the Bank (1) receives the invoice, (2) charges the debtor a "factoring fee" of .75% of the amount of the invoice, (3) deducts 20% of the amount of the invoice and applies it to a "reserve" account of the debtor, and (4) "advances" the remaining 80% of the invoice to the debtor, and charges the debtor interest at the prime rate plus 2% on the funds so loaned. If payment is not received by the Bank on the invoice assigned, the amount of the invoice is first charged against the reserve account of the debtor and to the extent the reserve account is not sufficient to cover the accounts, the Bank would seek recovery from the debtor or the personal guarantors.

e. If the debt were paid in full, then the bank would claim no interest in the remaining accounts receivable of the debtor. Once the $280,000.00 debt is paid, the debtor is then the undisputed owner of the remaining $480,000.00 worth of accounts receivable.

f. There are differences between a factoring contract and an accounts receivable financing contract and these differences were enumerated by this witness.

3. Though it is undisputed that the Bank is claiming an ownership interest in approximately $800,000.00 of accounts receivable, the Bank could not adequately explain why it would return the remaining accounts to the debtor once the $280,000.00 debt was satisfied if in fact it owns these prepetition accounts.

4. The statements on the accounts receivable prepared by the Bank show that the amount of each invoice "assigned" to the Bank is the exact amount that the Bank shows as the potential risk to the debtor.

5. The debtor's president summarized the aging of the accounts, grouping them as follows:

| | |
|---|---|
| 0–30 days | $224,000.00 |
| 30–60 days | $234,000.00 |
| 60–90 days | $194,000.00 |
| 90–120 days | $166,000.00 |
| Over 120 days | $342,000.00 |

He further stated that approximately $394,000.00 in accounts are over 60 days past due and are "ineligible accounts" under the Bank's formula for making advances. Another $27,000.00 in accounts are less than 60 days past due but are disputed. Another $137,000.00 in accounts are less than 60 days past due but are owed by the same customers who owe accounts which are more than 60 days past due. He stated that when these categories are subtracted from the total accounts, the Bank is left with "good accounts" of around $242,000.00 while it has advanced to the debtor about $282,000.00, leaving a deficit of approximately $40,000.00.

6. The debtor has collected and retained post petition approximately $335,000.00 in proceeds from factored invoices.

## ISSUES

1. Whether the document entitled "Factoring Contract and Security Agreement" entered into between the Bank and the debtor constitutes a sale of specific account receivables of the debtor or creates and reflects a loan secured by these accounts?

2. If the court finds that the agreement is a secured loan and the accounts are therefore cash collateral, is the Bank adequately protected?

## CONCLUSIONS OF LAW

The Bank claims the document entitled "Factoring Contract and Security Agreement" is a true factoring agreement by virtue of the language contained in the document that would normally evidence a true factoring agreement.[2] However, the court in *Major's Furniture Mart v. Castle*

---

**2.** The "Factoring Contract and Security Agreement" contains such phrases as "absolute owner", "Purchase of Accounts Receivable", and the debtor's warranties and representations for "each account receivable assigned and sold to Factor hereunder".

*Credit Corporation,* 602 F.2d 538, 543 (1979) stated that courts are not bound by how the parties identify their relationships in the documents.

"Courts will not be controlled by the nomenclature the parties apply to their relationship": *Kelter, Tr. v. American Bankers' Finance Co.,* 306 Pa. 483, 492, 160 A. 127, 130, 82 A.L.R. 999. [ (1932) ] In *Smith–Faris Company v. Jameson Memorial Hospital Association,* 313 Pa. 254, 260, 169 A. 233, 235, [ (1933) ] it was said: " 'Neither the form of a contract nor the name given it by the parties controls its interpretation. In determining the real character of a contract courts will always look to its purpose, rather than to the name given it by the parties. \* \* \* The proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but upon the entire body of the contract and its legal effect as a whole.' 6 R.C.L., p. 836 § 226." *Capozzoli v. Stone & Webster Engineering Corporation,* 352 Pa. 183, 42 A.2d 524, 525 (1945). *See Also In re Joseph Kanner Hat Co., Inc.* 482 F.2d 937, 940 (2d Cir.1973) ("[C]ourts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen.").

■■■ Regardless of the terms of a written agreement a court sitting in equity may look to the practices, objectives, relationship, and intention of the parties in determining the true meaning of a document. For instance, the cases are numerous where a Court has held that a deed or bill of sale absolute on its face was intended as a mortgage. *Williams v. McManus,* 73 S.E. 1038, 90 S.C. 490 (1912); *Brockington v. Lynch,* 112 S.E. 94, 119 S.C. 273 (1922); *Sparks v. Green,* 67 S.E. 230, 85 S.C. 109 (1910); *see also* 14 C.J.S. *Chattel Mortgages* § 6. Where a conveyance is made as security for a debt it is a mortgage regardless of the label placed upon it by the parties. *Bryan v. Boyd,* 84 S.E. 992, 100 S.C. 397 (1915); "Leases" and "security agreements" have been examined in many

instances to determine their true character. *In re Pledger Roy Wood,* 7 B.R. 543 (1980); *In re Merritt Dredging Co., Inc.* 839 F.2d 203 (4th Cir.1988).

In *Major's Furniture Mart v. Castle Credit Corporation, supra,* the Third Circuit examined the relationship between the parties and found that upon the record it was apparent that none of the risks present in a true sale were present, nor had the custom of the parties or their relationship given rise to more than a debtor-creditor relationship in which the debtor's debt was secured by a transfer of its customer accounts to the creditor. See also *Fireman's Fund Ins. Cos. v. Grover,* (In re Woodson Co.), 813 F.2d 266 (9th Cir.1987).

Similarly, in *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659 (D.Me.1982), the court examined the relationship between the parties in determining whether an assignment of the excess on a reserve account constituted an actual transfer or the creation of a security interest. In reviewing the relationship of the parties, the court relied upon the existence of the following factors:

1. A security interest is indicated where the assignee retains a right to a deficiency on the debt. (citations omitted)

2. A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source. (citations omitted)

3. ... A security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt. (citations omitted)

4. Evidence that the assignor's debt is not reduced on account of the assignment is also evidence that the assignment is intended as security.

5. Finally, the contract language itself may express the intent that the assignment is for security only. (citations omitted) In contrast, assignments have been found to be absolute transfers where the assignment operates to dis-

charge the underlying debt. (citations omitted)

In applying these factors to the relationship among the parties, the court in *Evergreen Valley Resort, Inc., supra,* held that the assignment created a security interest and that the excess reserve, subject to the assignment, was property of the estate pursuant to § 541 and cash collateral within the meaning of § 363.

■■■ Based upon the considerations applied by the court in *Major's Furniture Mart v. Castle Credit Corporation, supra,* it is clear in the case here that the Bank only has a security interest in the accounts receivable of the debtor. Namely,

A. The Bank does not bear any of the risk which could accompany a true purchase and transfer of ownership of the accounts. As indicated by the testimony of its Vice President, the Bank bears none of the risk of loss should the accounts not be paid. The debtor's exhibit 2 shows the debtor's risk, as determined by the Bank, is the same as the invoice amount given to the Bank on any given transaction.

B. Pursuant to the terms of the agreement, the Bank has full recourse against the debtor and should the debtor be unable to respond as the agreement is personally guaranteed by the principals of the debtor.

C. In the present case the relationship between the parties is more one of debtor-creditor than of grantor-grantee. The Bank, after deducting its factoring fee and depositing twenty percent (20.00%) in a reserve account, will loan the debtor eighty percent (80.00%) of the amount of each invoice. This transaction appears to be a loan in that the Bank charges interest on the outstanding amount at a rate of prime plus two percent (2.00%) until such time as the accounts receivable have been paid.

In a similar fashion, if the factors set forth in *Evergreen Valley Resort, Inc., supra,* are applied to the document in the present situation, it is apparent that the agreement merely creates a security interest for a loan and not a true sale of the accounts receivable, for these reasons:

A. As noted above, the Bank retains a right to a deficiency on the amounts advanced to the debtor, should the accounts receivable prove uncollectible. Not only does this deficiency extend to the amount of the invoice, but the Bank charges the debtor interest at the rate of prime plus two (2%) percent until such time as the invoices are collected.

B. As to the second consideration enumerated by the court in *Evergreen,* whether the assignee acknowledges that the assignment would be extinguished should the account balance be paid in full, the testimony of the Bank's officer indicated that any claim the Bank had to the accounts receivable of the debtor would be terminated and the accounts reassigned if the outstanding advances were paid in full.

C. As to the third *Evergreen* factor, inquiring whether the assignee has a duty to account to the assignor for any excess collected on the accounts, as noted above and by the court in *Evergreen,* sales of accounts are subject to the provisions of Article IX of the Uniform Commercial Code, Section 9–502(2) which requires the secured party to account to the debtor for any surplus collected on the account.

D. As to the fourth factor considered by the Court in *Evergreen,* whether the assignor's debt was reduced by the assignment of the accounts, the testimony in the present action indicates that the Bank is claiming an interest in accounts in excess of Eight Hundred Thousand ($800,000.00) Dollars. However, it claims to have outstanding advances of approximately Two Hundred Eighty Thousand ($280,000.00) Dollars. If the outstanding balance were reduced upon assignment of the accounts, it is clear that the debtor would be entitled to a credit in excess of Five Hundred Thousand ($500,000.00) Dollars.

E. Finally, the court in *Evergreen* considered whether the contract between the parties expresses language similar to a security agreement. While this element

is somewhat weak or lacking for the debtor here, the absence of this feature is not fatal to the debtor's position that this document reflects a loan rather than a sale.

On the basis of the testimony presented at the hearing, arguments of counsel, a review of the record, and after applying the elements considered by the courts in *Major's Furniture Mart v. Castle Credit Corporation, supra,* and *In re Evergreen Valley Resort, Inc., supra,* it is clear to this court that the relationship between the parties is actually one of debtor and secured party (loan) and not that of grantor and grantee (sale) as to the specific accounts. Therefore, the debtor is the owner of the accounts receivable and the Bank claims and has a security interest therein. The accounts receivable are property of the estate within the meaning of 11 U.S.C. § 541, and cash collateral within the meaning of 11 U.S.C. § 363.

■ Having found that the specific accounts receivable are cash collateral, the second issue before the court is whether the bank is adequately protected.

The debtor has suggested that the personal guarantee of its officer should constitute adequate protection to First Factors in this case. While it has been held that a guaranty secured by mortgages on two pieces of real property with substantial value may constitute adequate protection [*In re T.H.B. Corp.,* 19 C.B.C.2d 419 (Bankr.D. Mass.1988) ], *Collier* states that guaranties do not usually afford adequate protection. "The idea of a third-party guarantee as adequate protection is of very dubious validity since an unsecured guarantee would hardly be the 'indubitable equivalent' of collateral. An acceptable alternative might be a letter of credit issued by a responsible financial institution." 3 *Collier Bankruptcy Practice Guide* § 41.06(3) (1989). There is no evidence in the record about Mr. Poole's financial condition and even if there were, an unsecured guaranty of a principal of the debtor offers little or no protection to the Bank.

Also, the debtor has openly violated the prohibitions of § 363 of the code by its post petition use of proceeds in which the bank has an interest without its consent and this action is an element considered by this court on the issue of adequate protection.

For all the above reasons, the bank is not adequately protected by debtor's use of cash collateral and this use is hereby denied.

AND IT IS SO ORDERED.