In re DUNES HOTEL ASSOCIATES,
a South Carolina general
partnership, Debtor.

DUNES HOTEL ASSOCIATES, a South
Carolina general partnership, in its ca-
pacity as the Debtor–in–Possession rep-
resentative of its Estate, Plaintiff,

v.

HYATT CORPORATION, a Delaware cor-
poration, and S.C. Hyatt Corporation, a
South Carolina corporation, Defendants.

Bankruptcy No. 94–75715–W.
Adversary No. 95–08042.

United States Bankruptcy Court,
D. South Carolina.

March 28, 1997.

Michael M. Beal, Columbia, SC, Claude D. Montgomery, New York City, for Defendants.

**ORDER**

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER is before the Court upon the "Order" and "Judgment in a Civil Case" entered July 30, 1996 (**"Remand Order"**) by the United States District Court for the District of South Carolina. The District Court's Remand Order reversed, in part, this Court's "Order" and "Judgment" of August 25, 1995 (**"Adversary Dismissal Order"**) and remanded to this Court for an evidentiary hearing the issue of whether the debtor, Dunes Hotel Associates (**"Dunes"**) may reject the Agreement and Lease dated November 2, 1973 as amended and assigned (the **"Agreement"**), between Dunes and Hyatt Corporation as an executory management agreement under Section 365 of the Bankruptcy Code.[1] By Order entered November 26, 1996 on the motion of defendants Hyatt Corporation and S.C. Hyatt Corporation (together, **"Hyatt"**), this Court bifurcated the issues on remand into first, whether the Agreement is a lease of real property subject to the protections of Section 365(h)[2] or a management agreement, and second, whether Dunes has met the standard under Section 365(a) for rejecting the Agreement.

Based upon the testimony and other evidence presented in the hearing before the Court on February 12, 13 and 14, 1997 and consideration of the arguments of counsel and of all pleadings filed in this proceeding, the Court concludes that the Agreement is a lease of real property under South Carolina law. The Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52, made applicable by Fed. R. Bankr.P. 7052.

Julio E. Mendoza, Jr., Columbia, SC, John J. Dawson, Phoenix, AZ, for Plaintiff.

1. 11 U.S.C. § 101 et seq. Further references to the Bankruptcy Code will be by section number only.

2. When a debtor/lessor rejects a lease of real property, the debtor is no longer obligated to perform under that lease. The lessee, however, has the option under Section 365(h) either to treat the rejection as a breach and file a claim for the resulting damages, or to remain in possession of the property. If the lessee chooses to remain in possession it will be subject to all the terms of the rejected lease, but with no claim for damages other than the right to offset against future rental payments the value of any damages caused by the debtor's nonperformance.

## FINDINGS OF FACT[3]

1. Plaintiff Dunes Hotel Associates is a South Carolina general partnership formed in 1972 and located in Stamford, Connecticut.

2. The general partners of Dunes are Andrick Hotel Corporation ("**Andrick**") and Meyers Enterprises, Inc. ("**Meyers**"), both of which are Delaware corporations located in Stamford, Connecticut. The stock of Andrick and of Meyers is wholly owned by an affiliate of the General Electric Pension Trust ("**GEPT**"). GEPT is one of the largest trusts in the United States with assets of approximately $28–30 billion.

3. Dunes is the title holder of approximately 10 acres of land on Hilton Head Island, Beaufort County, South Carolina, which together with the buildings and improvements constitute the **"Hotel Property"**. The Hotel is a 505–room resort/convention hotel known as the "Hyatt Regency Hilton Head" (the **"Hyatt Regency"**).

4. On November 18, 1994, Dunes filed a voluntary petition under Chapter 11 of the Bankruptcy Code. At all times since the filing of the Dunes' Chapter 11 case, Dunes has been, and remains, the Debtor–in–Possession.

5. On February 27, 1995, Dunes filed its Complaint in this adversary proceeding.

6. The Complaint presented three (3) Claims for Relief, the second of which is the subject of the District Court's Remand Order. In that claim, Dunes seeks to reject the Agreement under Section 365(a) and requests a declaratory judgment that the Agreement is an executory management contract, not a lease which would be subject to the protections of Section 365(h).

7. This Court previously dismissed on summary judgment Dunes' Complaint in the Adversary Dismissal Order, entered August 25, 1995. Dunes sought reconsideration of that Order which this Court denied by an order entered December 6, 1995.

8. Dunes appealed from the Adversary Dismissal Order. In the July 30, 1996 Remand Order the District Court, *inter alia*, reversed in part and remanded Dunes' claim for rejection of the Agreement to this Court for further findings regarding whether Dunes could meet the standard for rejection of an executory agreement or lease.[4]

9. Messrs. Michael J. Strone ("**Strone**") and David W. Wiederecht ("**Wiederecht**") are authorized representatives of the Debtor.

10. Thomas S. "Sam" Cobb is a consultant hired by GEIC to be Dunes' local representative regarding the Hotel Property.

11. Alvin Dorsky is a senior real estate partner of the law firm of Wolf Block Schorr & Solis–Cohen who represented Dunes and its predecessors in the negotiation and subsequent amendments of the Agreement.

12. Hyatt Corporation is a Delaware corporation. S.C. Hyatt Corporation ("**S.C.Hyatt**") is a South Carolina corporation and a wholly owned subsidiary of Hyatt Corporation.

13. S.C. Hyatt occupies the Hotel Property and operates the Hyatt Regency pursuant to the Agreement.

14. The Agreement consists of the following five (5) documents:

a. The Agreement and Lease dated November 2, 1973, by and between Dunes Hotel Associates and Hyatt Corporation (**"1973 Agreement and Lease"**);

b. The First Amendment to Agreement and Lease dated January 19, 1976, by and between Dunes Hotel Associates and S.C. Hyatt Corporation (**"First Amendment"**);

c. The Letter Agreement dated July 1, 1983, by and between Dunes Hotel Associ-

---

3. Any findings of fact that should be conclusions of law shall be deemed such and vice versa.

4. In the same Order, the District Court affirmed this Court's dismissal of, and denial of reconsideration regarding, Dunes' first claim, which sought avoidance of the Agreement as an unrecorded leasehold pursuant to Section 544 on the grounds that no creditor would benefit from such avoidance. Dunes did not appeal the dismissal without prejudice of its third claim, seeking turnover pursuant to Section 542. The parties have informed the Court that Dunes' appeal to the United States Court of Appeals for the Fourth Circuit on its first claim has been dismissed as interlocutory, along with a protective cross-appeal by Hyatt from the reversal and remand of Dunes, rejection claim.

ates and Hyatt Corporation ("**1983 Amendment**");

d. The Amendment to Agreement and Lease dated November 7, 1984, by and between Dunes Hotel Associates and S.C. Hyatt Corporation ("**1984 Amendment**"); and

e. The Letter Agreement dated November 6, 1985, by and between Dunes Hotel Associates and S.C. Hyatt Corporation ("**1985 Amendment**").

15. No copy of the Agreement or any memorandum of it has ever been recorded in the real property records of Beaufort County, South Carolina.

16. In 1972, Hyatt and Dunes' predecessor entities negotiated for an agreement by which Hyatt would operate a resort hotel to be built on Hilton Head Island.

17. Alvin Dorsky participated in the negotiation and drafting of the 1973 Agreement and Lease and drafted or reviewed each amendment for Dunes or its general partners. Specifically, Mr. Dorsky drafted the first draft of the 1984 Amendment, including its rental and profit retention provisions.

18. As a result, the following provisions of the 1973 Agreement and Lease are particularly pertinent to a determination of the nature of the Agreement:

a. Section 21 provides that the "Agreement shall be governed in all respects by the laws of the State of South Carolina."

b. The Recitals provide that Hyatt is willing to enter into an agreement to provide technical assistance to Dunes "in connection with the planning of a first-class hotel on the Site and its preparation for operation."

c. The Recitals provide that: "Owner [Dunes] and Hyatt desire to enter into an agreement for such assistance and for a lease of the Hotel."

d. Section 2 states in part that the "Owner hereby lets and leases the Hotel to Hyatt and Hyatt hereby rents the Hotel from Owner...."

e. Section 2 also establishes a thirty (30) year "Term of Leasing" from December 31st of the year in which the Hotel first opens for business to the public, and grants to Hyatt an option to renew under the same terms of leasing for an additional ten (10) years, exercisable by Hyatt through written notice 18 months prior to expiration of the original term.

f. Section 3.1(a) provides Hyatt with a right of possession and right to operate the Hotel as a "business" conforming to a first class hotel standard, and for other activities which are customary and usual in connection with such operation. Under that provision, S.C. Hyatt has complete control and discretion over the operation of the Hotel, including, without limitation, the right to determine the terms of admittance.

g. Section 3.1(a) gives Dunes the right to approve Hyatt's choice of general manager for the Hotel.

h. Section 3.3 negates any implication that Dunes has some role in the operation of the Hotel which might arise from Dunes' ability to veto Hyatt's choice of general manager. Section 3.3 states that "right of Owner to receive rental based on the financial returns from the operation of the Hotel shall not be deemed to give Owner any interest, control or discretion in the operation of the Hotel."

i. Section 4 is entitled "Rental", Section 4.1(a) states that "Hyatt shall pay to Owner a rental." Section 4.1(b) defines the manner of rent computation for a development period and a post development period.

j. Section 4.1(c) governs the rental after an initial three year period and provides that "Rental for each fiscal year shall be payable in tentative monthly installments" equal to the lesser of "80% of the Profit [as defined elsewhere in the 1973 Agreement and Lease] ... or the Profit for such calendar month less 5% of the Gross Receipts of such calendar month...."

k. Section 12.2 provides that Dunes may terminate for "Inadequate Rentals" defined as less than a yearly rental of $975,000 for each year from the third fiscal year following the opening of the Hotel.

l. Section 4.2 provides for the place of payment of and states that "[E]ach pay-

ment of rental to be paid under Section 4.1 hereof shall be paid to Owner at its address ... or at such other place as Owner may ... designate in a notice to Hyatt."

m. Section 7.1 requires Hyatt to provide the Hotel with sufficient Working Capital Assets "to assure the uninterrupted and efficient operation of the Hotel at all times during the Term of Leasing." "Working Capital Assets" are defined as:

> all liquor and other licenses required to meet the applicable legal requirements and the current assets of the Hotel, including, without limitation, cash on hand and in banks, accounts receivable (less a reasonable reserve for doubtful accounts), food and beverage industry and operating supplies, and prepaid insurance and other prepaid items.

n. · Section 17.1 provides that Hyatt may not assign "its interest in the Hotel *and its other rights* under this Agreement" to an affiliate without the approval of Dunes unless that affiliate either has a net worth not less than that of Hyatt, or Hyatt remains fully liable for all obligations as if the assignment had not been made.

o. Section 7.5 requires Hyatt to pay "all real and personal property taxes assessed against the Hotel [during] the Tern of Leasing."

p. Section 8.2 requires that during the Term of Leasing, as distinguished from the pre-opening period, Hyatt must obtain "public liability insurance," "workmen's compensation" insurance, "insurance against loss or damage to the Hotel from fire" and "use and occupancy insurance" for the Hotel.

q. Section 7.3 restricts Dunes' right of entry to the Hotel, providing only a limited "right to enter upon any part of the Hotel" to inspect the Hotel or examine its books and records.

r. Section 3.2 provides that Hyatt may sublease space in the Hotel with the permission of the Owner.

s. Hyatt has executed subleases with at least the following sublessees with Dunes' consent: Elson's News and Gift Shops and Andrew Arnold Clothier and Furnisher.

t. Section 9(b) provides that upon the occurrence of damage or destruction of more than 25% of the Hotel, Hyatt has the right to override a decision by Dunes not to rebuild and Hyatt may use any insurance proceeds of Dunes for that purpose.

u. Section 10.1 provides that in the event of a condemnation or total taking of the Hotel Property, Hyatt has the right to a share of any resulting condemnation award.

v. Attached as an exhibit to the 1973 Agreement and Lease is a legal description ("metes and bounds") of the real estate included in the Hotel Property.

w. Nowhere in the Agreement is Hyatt given any option to purchase the Hotel Property at or before the end of the Term of Leasing.

x. There is one specific agency provision. The 1973 Agreement and Lease requires Hyatt to maintain a "Fund for Furnishings Replacements" (the **"FF & E Account"**) as a separate account in trust for Dunes. Hyatt so maintains the FF & E account.

19. The following provisions of the First Amendment are pertinent to a determination of the nature of the Agreement:

a. In its Recitals, the First Amendment states that Dunes and Hyatt Corporation had entered the 1973 Agreement and Lease, which the First Amendment defines as the "Lease", "respecting the construction by Owner of a hotel on Hilton Head Island, South Carolina, and the leasing of such hotel to Hyatt Corporation."

b. Section 12 of the First Amendment established the "Opening Date" of the Hotel as February 1, 1976. As a result, the "Term of Leasing" runs to December 31, 2006, plus a ten year renewal option to Hyatt.

c. Section 3(c) increases from $975,000 to $1,350,000 the minimum cumulative annual rental required under § 12.2 of the 1973 Agreement and Lease to avoid triggering the default provision for "Inadequate Rentals."

20. The 1983 Amendment is a letter agreement primarily intended to terminate a separate "Condominium Development Agree-

ment" entered into the same date as the 1973 Agreement and Lease, and to eliminate a cap on Hyatt's recovery of "Chain Services" expenses under "Section 7.2 of the Agreement and Lease." The 1983 Amendment was executed by Richard L. Schulze, an attorney who was the Vice President of Development for Hyatt Corporation at the time.

21. The "Re:" line of the 1983 Amendment refers to the Agreement as the "Hotel Management Agreement." The 1983 Amendment also refers to the 1973 Agreement and Lease "providing for Hyatt Corporation's management of the Hilton Head Hotel."

22. The 1984 Amendment is entitled "Amendment to Agreement and Lease" and, like the First Amendment, is a more formal document than the 1983 Amendment. The following provisions of the 1984 Amendment are pertinent to a determination of the nature of the Agreement.

   a. The Recitals specify that Dunes and Hyatt entered the 1973 Agreement and Lease "pursuant to which [Dunes] leased to [Hyatt Corp.] the hotel facility therein described (the 'Hotel Complex') which [Hyatt Corp.] agreed to manage under the trade name 'Hyatt on Hilton Head Island'...."

   b. Section 4 of the 1984 Amendment institutes a different calculation method for "rental otherwise payable" to Dunes during a defined "Adjustment Period" running from 1984 to 2000 in order to accommodate the financial impact of an expansion of the Hotel Property. The apparent purpose of the modified Rental calculation was to limit Hyatt's gain resulting from Dunes' additional investment in the property.

   c. For the first time under the Agreement, the 1984 Amendment defines Hyatt's retention or entitlement under the Agreement. Hyatt's retention under the modified Rental calculation during the Adjustment Period is called a "Basic Fee Amount". During the Adjustment Period, the amount of the Profit, as defined in Section 5.2 of the 1973 Agreement and Lease, is divided into five priority distributions. The first, to be retained by Hyatt, is stated to be the greater of 20% of Profit

or the Profit less 5% of gross revenues, but only to the extent Profit existed. Also during the Adjustment Period, rent payable to the Owner as a second level priority could not exceed four (4) times a specified dollar amount, termed the "Incentive Fee Cap." The third priority distribution of Profit goes exclusively to the Owner, while the fourth and fifth priorities are split between Dunes and Hyatt in different amounts.

23. The 1985 Amendment is a one-time waiver of Dunes' right to terminate the Agreement by reason of a Profit deficit resulting from the expansion and renovations to the Hotel undertaken in 1984 pursuant to the 1984 Amendment. The 1985 Amendment also provides a mechanism for Hyatt to finance a portion of the capital cost of the renovations as consideration for the waiver.

24. The 1985 Amendment defined the amount of Profit retained by Hyatt as "Hyatt's 'Management Fee', being in fact the portion of the revenues of the Hotel to be retained by Hyatt...."

25. The 1985 Amendment further provided that for that one year the Hyatt's Management Fee, as defined, would be deemed earned and payable from Profit prior to the deduction of certain "unanticipated funding requirements" and the calculation of "rent" payable to Dunes.

26. The waiver issue arose because the hotel expansion costs were excess FF & E and deducted from Profit pursuant to the 1973 Agreement and Lease, leading to an unanticipated deficit in Profit. In that situation, Hyatt had zero entitlement and continued working capital obligations while Dunes had the right to terminate the Agreement.

27. Under the 1985 Amendment, Hyatt contributed $1 million in "additional rent" to Dunes and made a $4 million "term loan" to Dunes to be repaid out of future Rental payments in order to fund a portion of the renovations under the 1984 Amendment.

28. Neither the 1984 or 1985 Amendments change the requirement that defined Profit must exceed zero for Hyatt to retain anything.

29. The Agreement does not contain an express agency provision beyond the requirement that Hyatt maintain the FF & E account in trust for Dunes. The Agreement does have a negation of partnership and joint venture provision.

30. South Carolina Code § 12–21–370 (1973) was passed by the South Carolina legislature in early 1973 and required payment of a tax on "leases of realty." This tax is sometimes referred to as a "documentary stamp tax."

31. Dunes paid a documentary stamp tax to the State of South Carolina based on the 1973 Agreement and Lease.

32. On September 11, 1987, following the addition of approximately two acres of land to the Hotel Property and the addition of approximately 200 rooms and related facilities to the Hotel building pursuant to the 1984 Amendment (the **"Improvements"**), Dunes was assessed by the South Carolina Tax Commission for a documentary stamp tax on the 1984 Amendment in the amount of $61,100.82, including interest.

33. Dunes contested the assessment of the South Carolina Tax Commission on the ground that the 1984 Amendment did not create a new lease but embodied a financial accommodation by the existing lessee, Hyatt, to the lessor, Dunes, for Dunes' additional investment in the Hotel Property.

34. The Beaufort office of the South Carolina Tax Commission disagreed with Dunes and informed Dunes that it could appeal to the Commission's Field Services Division's Appeals Group (**"Appeals Group"**).

35. The Appeals Group of the South Carolina Tax Commission denied Dunes' appeal, holding that the 1984 Amendment so modified the terms of the 1973 Agreement and Lease regarding the property subject to the lease and the rental that it resulted in an entire "new lease" for purposes of taxation.

36. In May of 1988, Dunes paid the assessment plus accrued interest totaling $64,601.98, and filed a request for a refund of the assessment pursuant to S.C.Code § 12–47–440.

37. In its formal letter brief to the Appeals and Audit Review Panel of the South Carolina Tax Commission (**"Tax Appeal"**) dated August 4, 1988, Dunes presented alternative arguments against the assessment.

38. Dunes argued first that the 1984 Amendment was not subject to the documentary stamp tax because it was not a lease or a renewal of a lease.

39. In the Tax Appeal, Dunes made at least six factual representations relevant to this proceeding.

First: Premises leased to Hyatt under the original Agreement included:

  1. The hotel site, consisting of the ten acres of beach front property; and

  2. The improvements, which include the hotel building and any such landscaping or other improvements necessary to meet a first-class hotel standard; and

  3. The furnishings and equipment and operating equipment [collectively referred to as "FFE"] [*See* §§ 1.1, 1.2, 1.3, and 2.0 OA]. (Tax Appeal at 3.)

Second: The term of the original lease extended from the opening date of the hotel, which was February 1976, until December 31, 2006. (*Id.*)

Third: Under the original Agreement Hyatt was to pay rent according to a two-tiered scheme based on the financial returns from operating the hotel. (*Id.*)

Fourth: The original Agreement provided for termination of the leasehold upon the occurrence of several contingencies. Those contingencies included among others, major casualty losses [*see* § 9(b) OA], inadequate rentals of hotel rooms [see § 12.20A], a deficit in profit [See § 12.30A] or a conversion to condominium ownership [*see* § 12.5 OA]. (Tax Appeal at 4.)

Fifth: Dunes anticipated a significant drop in rental payments under the percentage of profit basis set forth in the original Agreement. Accordingly, S.C. Hyatt agreed to make certain financial accommodations to Dunes for the decline in hotel revenues during the period of time of Dunes' increased investment (known

as the "Expansion Period"). (Tax Appeal at 5.)

Sixth: The amended Agreement did not alter or affect either the original term of the new lease, or the renewal term established in the Agreement. However. during a limited period of time known as the "Adjustment Period," between January 1, 1984, and December 21, 2000, the rent schedule set forth in the original Agreement was to be adjusted to reflect Dunes' aggregate expansion costs. (*Id.*)

40. Dunes' second argument against the assessment was that even if the 1984 Amendment was a new lease, only the value of the Improvements, the additional acreage and the new structures, should be used to determine the amount of the documentary stamp tax.

41. On December 22, 1988, the South Carolina Tax Commission entered "A Finding Concerning The Documentary Stamp Tax Liability Of Dunes Hotel Associates" ("**Finding**"), including findings of fact and conclusions of law, in which the panel held that the 1973 Agreement and Lease was an "agreement ... for the construction. development, management and leasing of a hotel ... [under which] Hyatt was obligated to pay Dunes rent based on the financial performance of the hotel." (Finding at 1.)

42. Dunes' second argument proved persuasive. The S.C. Tax Commission held that:

In the instant situation, it is questionable whether the 1984 amendment modifies the 1973 agreement to such an extent so as to create a new lease of the entire hotel. Although the developmental phase is changed along with its corresponding rental rate, all other terms of the original agreement remain the same. This gives us doubt as to whether a new lease on the hotel has been created.

On the other hand, we also reject Dunes' argument that the 1984 amendment failed to create a new landlord tenant relationship. In point of fact, such a relationship was created as to the additional two acres and the new wing. Prior to the 1984 amendment, no such property relationship existed. Simply stated, the amendment

did create a new lease, but only as to the new expansion.

*Id.* (Citation omitted.)

43. In 1986, Dunes executed a promissory note (the "**Promissory Note**") and other loan documents with Aetna Life Insurance Company ("**Aetna**") in order to evidence and secure a loan. As security for the Promissory Note, Dunes executed and delivered to Aetna several documents including an Assignment of Lease, dated June 13, 1986 (the "**Assignment of Lease**"), in favor of Aetna. Aetna recorded the Assignment of Lease in Book LB 17, Page 660 of the Office of the Register of Mesne Conveyances. The Assignment of Lease absolutely assigns to Aetna, *inter alia,* all of Dunes' rights, interest and privileges under the Agreement upon default by Dunes on the Promissory Note. The Assignment of Lease specifically identifies the lessor-lessee relationship between Hyatt and Dunes, specifically refers to and defines the Agreement as a "Lease", and attaches a description of the Hotel Property which is subject to the Agreement.

44. On August 16, 1994, pursuant to the Assignment of Lease, Aetna demanded Hyatt turn over to Aetna all rental payments under the Agreement.

45. Dunes' 1992 federal income tax filings, prepared by Arthur Andersen in July 1993, reflect no trade or business income or expenses. Dunes' 1992 IRS Form 8825— "Rental Real Estate Income and Expenses of a Partnership or an S Corporation"—shows "rental real estate income (gross)" to Dunes in respect of the Hotel in the amount of § 4.328,392.

46. Dunes' 1993 federal income tax return was filed on March 17, 1995, after Dunes filed this adversary proceeding. Dunes' 1993 return reflects gross receipts on sales of $26 million, but it also reports depreciation expense from "rental property," on several different schedules.

47. KPMG Peat Marwick changed the characterization of Dunes' income on Dunes' 1993 federal tax returns, filed March 1995, at the direction of Dunes' management.

48. S.C. Hyatt consistently treated the Agreement as a lease in its tax returns. Hyatt also consistently characterized the Agreement as a lease in the Hotel's audited financial statements, prepared by the accounting firm of Coopers & Lybrand.

49. In a January 28, 1994 memorandum, Sam Cobb responded to a request by David Wiederecht about "how the lease/management agreement should be changed." Cobb stated that it would be necessary to alter terms regarding the:

> (1) duration of the lease, (2) absence of financial incentive to grow profits, (3) lack of owner control authority, and (4) relative ease that Hyatt can earn a high (my opinion) fee. *If we can change the agreement from a lease to a management agreement* and one of the other projects (time share or conference center) move forward. I think they will shorten the duration and *remove some of the onerous language relating to control.* (Emphasis added).

In the same memorandum, Cobb opined that:

> Many clauses contain phrases such as "term of lease", "during the construction period", "prior to opening" and "condominium development"; *if we change to a management agreement, the entire contract should be revised to eliminate phrases and articles that are no longer relevant.* (Emphasis added.)

50. In a memorandum dated January 29, 1994, Cobb explained to Wiederecht that:

> If we can get the agreement changed from a lease to a management agreement which renews on a 5 year term, *gives us more contractual rights in setting policy* and selecting key managers, and has a termination provision if we sell, then I don't think a variance of $100,000 or so in the fee is very important. (Emphasis added.)

51. On March 15, 1994, David Wiederecht wrote a letter to Douglas Geoga, at the time, Executive Vice President of Hyatt Development Corp., noting that:

> As you are aware, *our current arrangement is in the form of a lease.* We understand that this form was imposed by Hyatt for some reason never made clear to us. The Hyatt agreement is the only management agreement with respect to our hotels which is in the lease format, and I would suspect that Hyatt does not have too many in that form. *In this context, we propose to change the existing lease to a management contract* with a term, termination language, and fee arrangement(s) consistent with today's environment. (Emphasis added.)

52. Hyatt declined Dunes' proposal to change the Agreement from a lease to a management agreement.

53. Mr. Wiederecht's testimony regarding his March 15, 1994 letter to Mr. Geoga was not persuasive either as to Dunes' understanding of the nature of the Agreement or the custom and practices of the parties. While Mr. Wiederecht testified that the Agreement's fee structure is similar to that found in other management agreements with which he is familiar, his March 15, 1994 letter indicated his desire to put in place a fee structure that was consonant with a 1990's management agreement.

54. Mr. Wiederecht also acknowledged in a letter dated April 8, 1994 to David Johnson of Aetna, then Dunes' secured creditor, that the Agreement "is actually a lease which was done in the 70's."

55. In its December 1994 Schedules of Assets and Liabilities filed in this bankruptcy case, Dunes stated: "(1) that it had only one creditor holding a secured claim [Aetna] and no unsecured, non-priority creditors; and (2) that there were no secured tax claims against the Debtor." In two footnotes Dunes stated that any tax or trade creditor claims were assertable only against S.C. Hyatt under the terms of the Agreement.[5]

---

5. Dunes amended its Schedules subsequent to the filing of a motion by Hyatt and Aetna to dismiss the Chapter 11 case on the grounds, *inter alia,* of lack of creditors consenting to a plan of reorganization. The Amended Schedules listed over three hundred thousand dollars in trade payables for Hotel vendor payments as obligations of Dunes. All of these vendors were paid by S.C. Hyatt in the ordinary course of business, and Dunes took their names from S.C. Hyatt's trade payables ledgers. The Court takes judicial notice of the Wolf Block order entered herein, to which Dunes did not object, that this turnabout by Dunes was undertaken in bad faith.

56. Dunes specifically abandoned any argument that the relationship between the parties may have evolved from that of a lease to a management agreement and relies upon the argument that at all times since the inception of the Agreement, it was in economic substance a management agreement.

57. Dunes proffered the expert testimony of three witnesses in support of its position; Raymond Ciccone ("Mr. Ciccone"), Suzanne Mellen ("Ms. Mellen") and Ronald Wilcomes ("Mr. Wilcomes").

58. Hyatt proffered the expert testimony of Peter R. Tyson ("Mr. Tyson") and Otis Allen Jeffcoat, III ("Mr. Jeffcoat"). The Court finds the testimony of Mr. Tyson and Mr. Jeffcoat consistent with the documents and the course of conduct of the parties and therefore more credible and convincing than the testimony of the experts proffered by Dunes.

### CONCLUSIONS OF LAW

■ Dunes contends that the economic substance of the Agreement and the parties' course of conduct under the Agreement show that it is a hotel management contract rather than a lease. The nature of this Agreement and the meaning of its terms are governed by the choice of law provision of the Agreement. Therefore, South Carolina law determines whether the Agreement is a lease or management agreement.

Under South Carolina law, the Court's first step is to determine if the terms of the contract are ambiguous. Only upon a determination that those terms are ambiguous is it necessary to look to extrinsic evidence, such as the parties' course of conduct or negotiating history, to give meaning to any contractual terms found to be ambiguous. If a contract is not ambiguous, the parol evidence rule precludes the admission of evidence regarding inconsistent custom or conduct of the parties. *Tow v. Miners Memorial Hosp. Ass'n,* 305 F.2d 73, 76 (4th Cir.1962); *C.A.N. Enters. v. South Carolina Health & Human Servs. Fin. Comm'n,* 296 S.C. 373, 373 S.E.2d 584, 586 (S.C.1988) ("Extrinsic evidence giving the contract a different meaning from that indicated by its plain terms is inadmissible."); *Moss v. Porter Bros., Inc.,* 292 S.C.

444, 357 S.E.2d 25, 28 (S.C.Ct.App.1987) ("The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of a contract.").

### A. Elements of a Lease under South Carolina Law

■ The essential elements of a lease under South Carolina law are:

(a) a grant of the possession and of the exclusive use and enjoyment of the [owner's] property, (b) for a definite consideration or rental which is susceptible of being made certain, and (c) for a definitely expressed and certain term ...

*Columbia Ry. Gas & Elec. Co. v. Jones,* 119 S.C. 480, 112 S.E. 267, 271 (S.C.1922). *Accord Player v. Chandler,* 299 S.C. 101, 382 S.E.2d 891, 894 (S.C.1989) ("The essential terms and conditions of a lease agreement include a definite agreement as to the extent and boundary of the property to be leased, the term of the lease, the rental as well as the time and manner of payment"); *Carson v. Living Word Outreach Ministries,* 315 S.C. 64, 431 S.E.2d 615, 618 (S.C.Ct.App. 1993) (landlord-tenant relationship is established where party "occupies the premises of another in subordination to that other's title and with his assent"); *B–L–S Constr. Co. v. St. Stephen Knitwear, Inc.,* 276 S.C. 612, 281 S.E.2d 129, 130 (S.C.1981) (finding lease where parties agreed to rental amount for specific premises and a set term met *Columbia Ry.* standards). *See also* 4 *Thompson on Real Property* § 39.06(a)(7) at 522 (four requisites of enforceable lease are a designation of the parties, the description of the property, the rent obligation and the duration of the lease).

■ The issue of whether a given agreement is a lease or another type of contract is governed by state law. *In re Huff,* 81 B.R. 531, 534 (Bankr.D.Minn.1988). *See also, Nobelman v. American Sav. Bank,* 508 U.S. 324, 329, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993) (contracts conveying an interest in real property, such as a mortgage, are to be interpreted under state law) (citing *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("[P]roperty inter-

ests are created and defined by state law," not federal law.)).

## B. *The Agreement Must Be Interpreted In Accordance With Its Own Terms*

■ Very recently the Supreme Court of South Carolina was unequivocal regarding the interpretation of a lease under South Carolina law:

> The judicial function of a court of law is to enforce contracts as made by the parties and not to re-write or distort, under the guise of judicial construction. the terms of an unambiguous contract.

*Dobyns v. South Carolina Dep't of Parks, Recreation and Tourism,* — S.C. —, 480 S.E.2d 81, 84 (1997). The Fourth Circuit has likewise held that as to issues of contract construction:

> If the court finds as [sic] matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the decision of the case. *Plain and unambiguous words, undisputed facts, leave no question of construction except for the court.*

*Tow v. Miners Memorial Hosp. Ass'n.,* 305 F.2d 73, 76 (4th Cir.1962) (emphasis added). To accomplish this end,

> the primary objective is to ascertain and give effect to the intention of the parties. The parties' intention must, in the first instance, be derived from the language of the contract.

*Gamble, Givens & Moody v. Moise,* 288 S.C. 210, 341 S.E.2d 147, 150 (S.C.Ct.App.1986) (citation omitted). *See also Nationwide Mut. Ins. Co. v. Commercial Bank,* — S.C. —, 479 S.E.2d 524, 526 (S.C.Ct.App.1996) ("If the intention of the parties is clear. courts have no authority to torture the meaning of [the contract's] language."). *See also Farr v. Duke Power Co.* 265 S.C. 356, 218 S.E.2d 431, 434 (S.C.1975).

■ The determination of whether a contract is ambiguous proceeds from a straightforward reading of the contract as a whole. *Benner v. Nationwide Mut. Ins. Co.,* 93 F.3d 1228, 1237 (4th Cir.1996) (focussing on the plain meaning of the words in the contract, courts should "use an objective test to determine the intent of the parties based on the meaning a reasonable person would attribute to the words used.") *C.A.N. Enters. v. South Carolina Health & Human Servs. Fin. Comm'n,* 296 S.C. 373, 373 S.E.2d at 586 (contract "must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense."); *Farr v. Duke Power Co.,* 265 S.C. 356, 218 S.E.2d at 433 ("Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract.")

■ "Mere lack of clarity on casual reading is not the standard for determining whether a contract is afflicted with ambiguity." *Gamble, Givens & Moody v. Moise,* 288 S.C. 210, 341 S.E.2d at 150, quoting *McCann v. Glynn Lumber Co.,* 199 Ga. 669, 34 S.E.2d 839, 845 (1945) ("Nor is a contract ambiguous within that sense merely because it may be even difficult to construe."); *Farr v. Duke Power Co.,* 265 S.C. 356, 218 S.E.2d at 433 (contract ambiguous "only when it may fairly and reasonably be understood in more ways than one"). Where the contract is not ambiguous, "it should be interpreted and enforced according to [the] plain and ordinary meaning" of its terms. *Nationwide Mut. Ins. v. Commercial Bank,* 479 S.E.2d at 526.

## C. *The Agreement Is Not Ambiguous*

The Agreement is acknowledged by both parties' experts to contain the requisites of a lease. This Court concurs. The parties explicitly state their intent to enter into a lease in the 1973 Agreement & Lease in the Recital at 2. There is a grant of real possession whereby Dunes "lets and leases the Hotel to Hyatt and Hyatt ... rents the Hotel from" Dunes. The grant of possession runs for a certain "Term of Leasing" of 30 years plus a 10 year renewal option. Hyatt is obligated to pay a defined "Rental" payable at a specific time and place. There is nothing ambiguous about these terms. While the Rental calculation formula is complex, and was made more so for a 16 year "Adjustment Period" [6] by the 1984 Amendment, complexity is not

---

**6.** The "Adjustment Period" runs from January 1, 1984 through December 31, 2000.

ambiguity. *Gamble, Givens & Moody v. Moise, supra.*

Dunes relies heavily on the use in the Amendments to the 1973 Agreement and Lease of terms commonly found in management agreements. These include:

— Definition in 1984 Amendment of the income derived by Hyatt during the Adjustment Period as a "Basic Fee Amount" and dollar amount cap on Hyatt's retention as an "Incentive Fee Cap".[7]

— Reference to the Agreement as the "Hotel Management Agreement" in the "Re:" line of the 1983 Agreement and description of the 1973 Agreement and Lease as providing for Hyatt's "management" of the Hotel.

— Use of the term "Management fee" in the 1985 Amendment, defined as "the portion of the revenues of the Hotel to be retained by Hyatt."

References in the 1983, 1984 and 1985 Amendments to Hyatt's "managing" or "management" of the Hotel.

None of these examples create an ambiguity in an essential term of the Agreement.

The 1973 Agreement and Lease gives no name or definition to Hyatt's income, nor do the 1976 and 1983 Amendments. Not until the 1984 Amendment, in which the income to Hyatt is given a priority allocation over Rental as to Profit during the Adjustment Period, is it called anything. Even allowing that the words "Basic Fee" and "Incentive Fee" are also common in management agreements, their appearance in the 1984 Amendment as part of the defined terms Basic Fee Amount and Incentive Fee Cap does not create ambiguity in the essential terms covering transfer of possession of defined realty under defined rental obligations. This is especially true when those terms, and the term "Management Fee" appearing in the 1985

Amendment, are all used and defined in the context of adjustments to "Rental" or "rent" to Dunes.

Dunes contends that the use in the Amendments of terms common in management agreements should be given extra weight because the Amendments were signed by experienced hotel executives from Hyatt, and in all but one instance, those executives were trained attorneys. However, the evidence showed that Mr. Dorsky, as counsel to Dunes, negotiated, drafted or reviewed each iteration of the Agreement. Mr. Dorsky also prepared the first draft of the 1984 Amendment and the 1985 Amendment. No adverse inference can be drawn against Hyatt under those circumstances.

Only the 1985 Amendment was executed for Hyatt by someone who was not an attorney—Mr. Posner. Most important, the terms of the 1973 Agreement and Lease unambiguously indicate an intent to create a lease. The Recitals expressly state the parties' "desire to enter into an agreement ... for a lease of the Hotel." The Amendments refer to the 1973 Agreement and Lease as the "Agreement and Lease" or the "Lease" whereby Dunes "leased" the Hotel Property to Hyatt. In each case in which the payments to Dunes are mentioned, they are referred to as "rent" or "rental."

Dunes' reliance on references to Hyatt's "managing" or "management" of the Hotel are unavailing. Hyatt does not dispute that it manages the Hotel for its own benefit or account pursuant to the Agreement.[8] As discussed more fully below, this is entirely consistent with South Carolina law regarding operating leases.[9] Dunes wishes the Court to characterize the Agreement *against its terms* as a management contract.[10] Such a recharacterization is not warranted here.

---

7. The Incentive Fee Cap refers to a cap on the Basic Fee Amount, rather than a cap on an "Incentive Fee" as there is no defined Incentive Fee. "Incentive" appears to refer to the cap on Hyatt's retention as an incentive to Dunes for its investment under the 1984 Amendment.

8. While the reference to the Agreement as the "Hotel Management Agreement" in the "Re:" line of the 1983 Amendment is, perhaps, not as

clear as it could be it does not alter or render ambiguous the essential terms of the Agreement.

9. *See* discussion of *Columbia Ry.* case, *infra.*

10. Dunes alleged that the lack of recordation of the Agreement indicates that it is not a true lease. It is undisputed that the Agreement is not recorded. However, recordation goes to the enforceability of a lease against judgment creditor

Where a contract is not ambiguous on its face, the construction of a contract becomes a question of law for the Court, and not an issue of fact. *See Watts v. Monarch Builders, Inc.*, 272 S.C. 517, 252 S.E.2d 889, 890–91 (S.C.1979) (where contract of sale was clear and unambiguous, "[i]n the absence of fraud the construction of the contract of sale [is] a matter of law for the court ....") (citing *Thomas v. Jeffcoat*, 230 S.C. 126, 94 S.E.2d 240 (S.C.1956)). *Accord Shipyard Property Owners' Ass'n v. Mangiaracina*, 307 S.C. 299, 414 S.E.2d 795, 801 (S.C.Ct.App.1992) ("Where an action presents a question as to the construction of a written contract and the language of the contract is clear and unambiguous, the question is not one of fact but one of law.") *See also, Gamble, Givens & Moody v. Moise*, 341 S.E.2d at 150.

### D. *The Columbia Railway Case Controls This Analysis*

The *Columbia Ry.* case is determinative of the precise question before this Court; that is, whether an agreement constituted a lease or a management agreement as a matter of South Carolina law. Under the agreement in the *Columbia Ry.* case, Columbia Railway Gas & Electric Company (the **"Columbia Company"**) operated a hydroelectric dam developed by an independent power company (the **"Owner"**). The agreement provided for, *inter alia:*

— The Columbia Company's exclusive possession and control of the property.

— The Columbia Company to maintain the property and pay all operating costs, taxes, and insurance.

— The Columbia Company to make payments on behalf of Owner of interest on the Owner's bonds, its preferred shareholders' dividends, and mortgage.

— The Columbia Company to permit entrance and inspection of the books by officers of the Owner and to provide the Owner with any reports required for the Owner's compliance with any applicable laws.

claims by third parties against the lessor, not to the characterization of the agreement as between

— Upon default and notice, the Owner could terminate the agreement and resume possession, and the agreement would constitute a lien upon the property.

The basis for the controversy over the nature of the agreement was the issue of which party would be liable for taxes on the income from the operation of the dam. The Columbia Company argued that the agreement was only a management agreement and that the income from the operation of the dam, and therefore the liability for taxes thereon, belonged to the Owner. The Supreme Court of South Carolina held that the agreement could not be an operating or trust agreement, or an agreement of sale, as the state contended. Rather, it had to be interpreted and given effect as a lease because it contained the essential elements of a lease. *Columbia Ry. Gas & Elec. Co. v. Jones*, 112 S.E. at 271 (a grant of possession and exclusive use and enjoyment, a definite consideration or rental that can be made certain, and a definite term). The Court found that the Columbia Company's payment of the Owner's bond interest and preferred shareholder dividends out of profits from the operation of the property constituted rental payments. *Columbia Ry. Gas & Elec. Co. v. Jones*, 112 S.E. at 272.

The Columbia Company made the argument, as Dunes does here, that the contract was an operating agreement only and that as operator, Columbia Company collected monies on behalf of the Owner and both the income and expenses of the operation were the Owner's. The Supreme Court rejected this argument in the face of the contrary terms of the agreement. *Columbia Ry. Gas & Elec. Co. v. Jones*, 112 S.E. at 271. *Accord City of Orangeburg v. Southern Ry. Co.*, 134 F.2d 890, 892–93 (4th Cir.1943) (even though lessee became the "virtual owners" of the property, the fact that it held the land pursuant to a lease was "not open to doubt," following *Columbia Ry.*) Each of the *Columbia Ry.* facts described above have an analog in the present case.

signatories.

Dunes contends that the Agreement has the economic substance of a management agreement; specifically, that Hyatt's "fee" is a percentage of gross receipts "taken off the top". However, it is clear that if there is no profit, Hyatt is not paid for its efforts but still retains liabilities under the Agreement. In fact, under the terms of the 1973 Agreement and Lease, both the Rental to Dunes and Hyatt's income are derived as a percentage of profit. The court in *Columbia Ry.* explicitly held that commercial properties "are commonly leased to tenants to be operated, expressly or impliedly, for the landlord, and rent is frequently reserved out of or *designated as a portion of* the proceeds or *profits." Columbia Ry. Gas & Elec. Co. v. Jones,* 112 S.E. at 271. *Compare State v. Page,* 1 Speers 408 (S.C.1843) (hotel manager not a lessee because his fee was paid regardless of whether there was a profit). Moreover, as in *Columbia Ry.,* Hyatt must meet a minimum rental provision (albeit cumulative) and it must fund operating expenses, taxes, and insurance regardless of whether there is sufficient income from the operation of the Hotel to cover those costs.

Upon a review of the terms of the Agreement, the Court finds that those terms are not ambiguous. As a result, the interpretation of the Agreement is a matter of law for this Court. The Agreement falls squarely within the analysis of the Supreme Court of South Carolina in the *Columbia Ry.* case. The Agreement purports to be a lease and contains all of the essential terms of a lease. Therefore, the Court must conclude that the Agreement is a lease as a matter of South Carolina law.

Having found that the Agreement is unambiguous, the Court is able to conclude that the Agreement is a true lease by looking to the lease agreement itself and the subsequent amendments without the need for extrinsic evidence. However, as Dunes has expended significant efforts to present ex-

trinsic evidence that the Agreement has not been referred to or treated as a lease by the parties, the Court will now review that evidence and for the following reasons, still must conclude that the Agreement is a true lease rather than a management agreement.

**E.  *There is No Basis To Recharacterize the Agreement***

As an initial matter, Dunes contends in its argument that it did not seek to recharacterize the Agreement.[11] However, Dunes cites this Court to cases concerning the recharacterization of leases and other types of agreements. *See International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744 (2d Cir.1991); *In re Merritt Dredging Co.,* 839 F.2d 203, 205 (4th Cir.), *cert. denied sub nom. Compliance Marine, Inc. v. Campbell,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988); *In re PCH Assocs.,* 804 F.2d 193 (2d Cir.1986); *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.),* 155 B.R. 824 (Bankr. N.D.N.Y.1993); *In re Carolina Util. Supply Co.,* 118 B.R. 412 (Bankr.D.S.C.1990). Several of the cases cited by Dunes primarily involved situations in which the courts were concerned with whether the parties had used the lease form as a disguised security agreement for personal property subject to the Uniform Commercial Code. In each of the cases cited by Dunes, however, the courts found that there was ambiguity in the terms of the documents, or that the terms of the documents did not agree with the documents' apparent form.

Dunes particularly relies on *In re PCH Assocs.* in which the Second Circuit explicitly acknowledged that the nature of an agreement is governed by state law and that parol evidence is admissible only where there is ambiguity in the terms. In that case, the party opposing recharacterization alleged that the caption of the document controlled its interpretation. Because the court found

---

11. Counsel for Dunes stated in his opening argument:

   I want to emphasize just as forcefully as I can that Dunes is not seeking to recharacterize anything, and it would be perfectly permissible if we were because, as you know from reading the proposed orders, there are legions of cases

which exalt substance over form, and which indicate that in that situation recharacterization is appropriate. But, because of what the documents, themselves, say, as a threshold matter, we don't need to recharacterize anything

Tr. 2/12 at 13 (Dawson).

that the terms of the agreement did not coincide with the caption, extrinsic evidence was needed to determine the true intent of the parties. *In re PCH Assocs.*, 804 F.2d at 197.

Similarly, in each of the cases cited by Dunes, the courts held that there was a significant disparity between the form of the document and its substance. For example, in *International Trade Admin. v. Rensselaer Polytechnic Inst.*, and *Hotel Syracuse*, the courts held that the rights and obligations conveyed by those putative leases were inconsistent with the rights and obligations typically conveyed in a lease under state law.[12] Such is not the case here. The Agreement conforms in virtually all significant particulars with the lease in the *Columbia Ry.* case. There is no convincing evidence in the record which indicates that the rights and obligations under the Agreement are inconsistent with a lease. A close reading of the 1973 Agreement and Lease leaves this Court with the unavoidable conclusion that the parties intended and succeeded in creating a lease.

The terms of the Agreement are consistent with a lease, and not a management agreement, in both form and substance. For example, the Agreement is entitled an "Agreement and Lease," recites the parties' intention to enter into a lease, and uses consistent lease terminology such as "lets and leases", "rental" and "term of leasing." The rights and obligations are also consistent with a lease. For example: Hyatt has the obligation to make monthly payments of Rental in exchange for exclusive possession and use, its leasehold may be terminated for "Inadequate Rentals," and it is liable for working capital, operating expenses, taxes and insurance. The importance of Hyatt's working capital obligations is reinforced by the prohibition in the 1973 Agreement and Lease on assignment by Hyatt Corporation to an affiliate unless such affiliate has at least the same net worth as Hyatt Corporation or Hyatt Corporation remains liable after the assignment. This "net worth" covenant makes sense only if Hyatt has ongoing financial obligations, such as the working capital and operating expense obligations under the Agreement, that require an entity with the creditworthiness of Hyatt Corporation.

By contrast, the Agreement does not contain provisions that are distinctive to management agreements, such as an express agency provision and a provision requiring owner approval of operating budgets. Nor are the economic relationships consistent with a management agreement because Dunes has none of the responsibility for operating expenses, taxes, or working capital, responsibilities which are indicative of a management agreement.

### F. *Extrinsic Evidence Supports the Interpretation of The Agreement as a Lease*

#### 1. *Hyatt Prototype Management Agreement*

Even if the Court were to hold that the Agreement is ambiguous, the extrinsic evidence presented as to its nature overwhelmingly supports the interpretation of the Agreement as a lease. Dunes sought to compare the Agreement to a prototype Hyatt management agreement published in 1988 by an attorney from Hyatt as part of an ALI-ABA course (the **"Shindler Materials"**). However, rather than supporting Dunes' claim that the Agreement is substantively the same as a management agreement, a comparison of the Agreement with the Shindler Materials serves only to highlight the differences.

Perhaps the most telling difference between the Agreement and the Shindler Materials is the fact that the prototype management agreement provides that "Owner hereby grants to Hyatt the sole and exclusive right to manage and operate the Hotel ... *as sole and exclusive agent of Owner.*" This express grant of agency was acknowl-

---

12. The *Merritt Dredging* case involved an equipment lease that was a disguised security agreement for a sale of a barge, while *Carolina Utilities* involved the question of whether under the South Carolina Commercial Code, a "factoring agreement" was a sale of accounts receivable or a security agreement for a loan against those accounts. Accordingly, the factual as well as the legal issues differ significantly from the question before this Court.

.edged by Dunes' expert, Ms. Mellen, as being present in virtually all management agreements by national hotel chains such as Hyatt. It is further supported by the literature regarding hotel management agreements and leases cited by both parties.[13] There is no express agency provision in the Agreement.

The comparable section of the Agreement provides that "Owner hereby lets and leases the Hotel to Hyatt and Hyatt hereby rents the Hotel from Owner." Similarly, in the Shindler Materials, the owner remains entirely liable for all operating expenses, working. capital obligations, insurance and taxes. Again, this is consistent with the literature.[14] Under the Agreement, Hyatt has the responsibility to provide all insurance (1973 Agreement and Lease § 8.2), pay all taxes (*id.* § 7.5), pay all operating expenses and provide sufficient working capital assets, including cash, "to assure the uninterrupted and efficient operation of the Hotel at all times during the Term of Leasing" (*id.* § 7.1). Finally, under the Shindler Materials, and in the literature, the operator is required to submit all operating budgets for approval by the owner. While Dunes submitted evidence that it has "input" into the budget, there is no provision which requires or invites Dunes' input or approval of the budget. Certainly, even Dunes' evidence does not show "control" by Dunes over the operating budget, contrary to the Agreement.[15]

### 2. *Hyatt Correspondence*

Dunes contends that correspondence by Hyatt officers indicates that Hyatt has always believed that the Agreement and Lease was a management agreement rather than a lease. In many cases, the references in the correspondence cited by Dunes is to Hyatt's managing or management of the Hyatt Regency Hilton Head. However, pursuant to the Agreement, Hyatt does manage the Hotel for its own account.

While the reference in a Posner letter to a "minimum return (management fee) to Hyatt" does, by itself, sound like terms of a management agreement, the rest of that letter makes clear that if there is no profit, Hyatt would receive no "management fee" and that Hyatt has working capital responsibilities under the Agreement even in the absence of profit. Those are the concerns of a lessee, not a party to a management contract.

That letter led directly to the drafting of the 1985 Amendment, which must control. The 1985 Amendment, initially drafted by Dunes, specifically defines Hyatt's "'Management Fee', [as] being in fact the portion of the revenues of the Hotel to be retained by Hyatt" as part of the calculation of a one-time adjustment to the payment of "rent" to Dunes. While the terms used by Hyatt personnel in referring to the Agreement are often terms commonly occurring in reference to management agreements,[16] in the operative documents, those terms are defined in such a way as to be consistent with a landlord-tenant relationship between Dunes and Hyatt. *See C.A.N. Enters. v. South Carolina Health & Human Servs. Fin. Comm'n,* 296 S.C. 373, 373 S.E.2d 584, 586 (S.C.1988) (where parties define terms, contract will be interpreted according to parties' definition if not inherently ambiguous).

Mr. Wiederecht and Ms. Mellen on behalf of Dunes asserted to the Court that Hyatt receives effectively a "management fee" of

---

13. *See* James J. Eyster, *The Negotiation and Administration of Hotel and Restaurant Management Contracts,* Appendix A at 163 (1988) (noting that an express agency provision occurs in 100% of chain hotel management agreements)

14. *See* Stephen Rushmore, *Hotel Investments, A Guide for Lenders and Owners,* at. 15–1 (Supp. . 1992) (under management agreement, owner retains all financial responsibilities for working capital and operating expenses); Eyster, Appendix A at 169, 172

15. Dunes does have the right to approve the appointment of a general manager for the Hotel. 1973 Agreement and Lease § 3.1(a). While this provision is acknowledged by Hyatt's expert to be unique in his experience for a hotel lease, it does not rise to the level of creating an ambiguity regarding Dunes' control over operating budgets.

16. As was repeatedly testified to by witnesses of both parties, management agreements are currently much more common than leases, and the vernacular of such agreements has become similarly common.

five percent of gross revenues "off the top." However, those witnesses also stated that the terms of the Agreement do not permit Hyatt to retain its "fee" out of gross revenues before the determination of profit; rather, Hyatt can only receive income if there is a profit. Moreover, Hyatt remains liable for operating expenses, taxes, insurance and working capital regardless of whether there is any profit from which it can derive its "fee" or not.

Dunes has argued that Hyatt pays all expenses out of the gross revenues of the Hotel, what Dunes terms the "Hotel Income", and that the burden of those expenses is Dunes'. In fact, if the Agreement is a lease, the gross revenues belong to Hyatt. Prior to Dunes' bankruptcy, both Hyatt and Dunes reported the income to Dunes as rental income on their respective financial statements and tax returns. Hyatt reported the gross revenue from the operation of the Hotel and the expenses of that operation, including an expense for rent to Dunes. Following the filing of the bankruptcy, Dunes' representatives directed Dunes' accountants, KPMG Peat Marwick, to change the way income was reported by Dunes so that for the first time, Dunes reported the gross revenues of the Hotel as its own income and the expenses as its own expenses. Dunes' accountant testified in his deposition that there was no impact either way on Dunes' tax liability from the change in reporting, and the only reason for the change was Dunes' direction. KPMG Peat Marwick did not undertake to verify the accuracy of Dunes' representations regarding the source and amount of its income. Under these circumstances, the Court must conclude that the change was undertaken by Dunes as a litigation tactic. The pre-bankruptcy financial statements and tax returns of both Dunes and Hyatt are consistent with, and indicative of, the Agreement being a lease.

### G. *Course of Conduct*

Dunes contends that the Agreement must be interpreted by reference to the parties' course of conduct, citing *Farr v. Duke Power Co.*, 265 S.C. 356, 218 S.E.2d 431, 434 (S.C. 1975) (the "practical interpretation of the contract by the parties to it for any considerable period of time before it becomes the subject of controversy will be entitled to great, if not controlling, influence.") A review of the parties' course of conduct as presented in the evidence before the Court, however, reveals that the course of conduct was consistent with the interpretation of the Agreement as a lease.

In *Farr v. Duke Power*, the Supreme Court of South Carolina found that the plaintiffs course of conduct over the life of a contract had been consistent with the plain meaning of the terms of the contract. Only at the end, in an effort to create a compensable breach, did the plaintiff begin asserting a new and inconsistent meaning for the relevant terms.

A similar review of the parties' conduct in this case leads to a similar result. Dunes has consistently represented to third parties that the Agreement is a lease, as may be seen in Dunes' pre-bankruptcy tax returns, contracts it signed with third parties relating to the Hotel Property in which it defined the Agreement as a lease, security instruments which it signed pledging its interest in the lease created by the Agreement, its initial bankruptcy statements and schedules in this Court, and in its representations to the South Carolina State Tax Commission. Hyatt likewise always represented to third parties that the Agreement is a lease, as may be seen from Hyatt's own tax returns and audited financial statements, and the subleases it has entered for retail space in the hotel.

### H. *Dunes' Admissions Support Conclusion That Agreement is a Lease*

Supporting the conclusion of the Court, though not necessary to the Court's analysis, is the extrinsic evidence of the numerous admissions by Dunes' representatives regarding the nature of the Agreement. These include the correspondence from 1994, prior to Dunes' filing for bankruptcy protection, between Dunes' authorized representative, David Wiederecht, and Dunes' representative at the Hotel Property, Sam Cobb. In that correspondence, Mr. Cobb responds to apparent inquiries from Mr. Wiederecht on ways to change the Agreement from a man-

agement agreement to a lease. In that correspondence, Mr. Cobb points to many of the very terms upon which this Court relies in finding that the Agreement is a lease as terms which must be altered or eliminated to effect such a change.

Similarly, Mr. Wiederecht sent a letter to Mr. Geoga requesting that Hyatt agree to change the Agreement from a lease to a management agreement. Hyatt did not agree to do so. While Mr. Wiederecht testified that he was not aware of Dunes having represented to third parties that the Agreement was a lease, the record contains ample evidence of letters and documents executed by Mr. Wiederecht and other Dunes representatives representing precisely that the Agreement is a lease.

Also relevant are the statements by Dunes in the proceedings before the South Carolina Tax Commission that the 1973 Agreement and Lease was a lease, that it established a landlord-tenant relationship between Dunes and Hyatt, and that the 1984 Amendment was merely a modification of the original 1973 Agreement and Lease, or, at most, a new lease as to the Improvements. While these extrinsic facts support this Court's ruling, as noted above, they are not necessary to the Court's conclusion.

## I. *Estoppel*

Hyatt contends that Dunes should be estopped to argue that the Agreement is a lease on grounds of both judicial estoppel and collateral estoppel. However, this Court held in a prior order in response to a motion in limine by Hyatt, that judicial estoppel should not apply in this case. In the present case, Hyatt claims that Dunes previously asserted in a contested proceeding before the South Carolina Tax Commission that the Agreement is a lease. In the proceedings before the South Carolina Tax Commission, Dunes propounded a definition of a lease which was consistent with, though broader than, the definition laid out in the case law cited above. Dunes argued that "[t]raditionally, a lease sets forth provisions whereby land is demised by the landlord to the tenant or whereby the tenant receives possessory rights over the realty."

■ The doctrine of collateral estoppel is intended to prevent relitigation of issues which were previously litigated and directly determined in the prior action. *McPherson v. Dept. of Hwys. & P. Transp.*, 297 S.C. 303, 376 S.E.2d 780 (S.C.Ct.App.1989). In *Beall v. Doe*, 281 S.C. 363, 315 S.E.2d 186, 191 (S.C.Ct.App.1984), the court held that:

> In order ... to assert collateral estoppel successfully, the party seeking issue preclusion still must show that the issue was actually litigated and directly determined in the prior action and that the matter or fact directly in issue was necessary to support the first judgment.

*See also, Town of Sullivan's Island v. Felger*, 318 S.C. 340, 457 S.E.2d 626 (S.C.Ct.App. 1995) (same). In determining whether collateral estoppel should be recognized, courts often examine: (1) privity, (2) whether the doctrine is used offensively or defensively, and (3) whether the party adversely affected had a full and fair opportunity to litigate the relevant issue effectively in the prior action. *Pye v. Aycock*, —— S.C. ——, 480 S.E.2d 455 (S.C.Ct.App.1997).

The South Carolina Supreme Court has adopted the principle that privity should be disregarded in determining whether to apply the doctrine of collateral estoppel. *Graham v. State Farm Fire & Cas. Ins. Co.*, 277 S.C. 389, 287 S.E.2d 495, 496 (S.C.1982). *See also*, Daniel F. Norfleet, Practice and Procedure, Defensive Collateral Estoppel: Privity No Longer a Requirement, 35 SCLR 107 (1983). Additionally, in *Beall v. Doe*, 315 S.E.2d at 190, the South Carolina Court of Appeals found that collateral estoppel should be allowed both offensively and defensively.

■ There also is little question that the order of the South Carolina Tax Commission could be accorded estoppel effect in appropriate circumstances. In *Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 107–08, 111 S.Ct. 2166, 2169–70, 115 L.Ed.2d 96 (1991), the United States Supreme Court stated that:

> We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. "When an administrative agency is acting

in a judicial capacity and resolves disputed issues of fact properly before it which the parties have an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." . . . The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, . . . which acts in a judicial capacity. (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) (citations omitted)). The Tax Commission was acting in a judicial capacity when arguments were presented to it by Dunes in August 1988 and when it issued its ruling dated December 22, 1988. Dunes did not appeal, thereby making it a final determination of the issues actually litigated.

This Court has previously held that the issue of whether the Agreement was a "management agreement" was not directly argued by Dunes before the S.C. Tax Commission or decided by that body.[17] However, the question of whether it was a "lease" was argued. Accordingly, the Court, without concluding that collateral estoppel is controlling, may and does give weight to the representations of fact and arguments made by counsel in that proceeding for Dunes that the Agreement is a lease.

### CONCLUSION

Pursuant to all of the foregoing Findings of Fact and Conclusions of Law, the Court hereby finds that the Agreement is not ambiguous, that it contains all the elements and meets the requirements of a leasehold interest under South Carolina law. Moreover, the extrinsic evidence before the Court regarding the economic substance of the Agreement, the admissions of the parties, and the course of conduct support, but are not necessary to the conclusion that the Agreement is a lease.

**AND IT IS SO ORDERED.**

---

17. *See* "Judgement" and "Order" entered February 12, 1997 on Hyatt's Motion for Application of Judicial Estoppel and Memorandum in Support, at 10–11.