**In re EVERGREEN VALLEY RESORT, INC., Debtor.**

**Bankruptcy No. 182–00225.**

United States Bankruptcy Court,
D. Maine.

Oct. 7, 1982.

John B. Cole, Skelton, Taintor & Abbott, P.A., Lewiston, Maine, for Maine Guarantee Authority.

Richard E. Poulos, Portland, Maine, for debtor.

## MEMORANDUM OF DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

The debtor, Evergreen Valley Resort, Inc. (Evergreen) has filed an application for authority to use cash collateral consisting of approximately $21,500 in excess reserves held by Casco Bank & Trust Co.[1] and proceeds from the sale of timber. A hearing was held on the issue of use of the excess reserves only.[2] All parties consent to the use of the excess reserves except Maine Guarantee Authority (MGA). MGA opposes the application on the grounds that the excess reserves are not property of the estate, and, therefore, cannot be used by Evergreen pursuant to § 363 of the Bankruptcy Code.[3] MGA acknowledges, for the purpose of this application only, that it is adequately protected in the event the Court determines the excess reserves to be property of the estate. Thus, the only issue before the Court is whether the excess reserves are property of the estate. Testimony was taken at the hearing and the parties have filed briefs. The Court finds the following facts.

Evergreen is a debtor in possession under Chapter 11 of the Bankruptcy Code,[4] and operates as a year-round resort facility. On November 1, 1976, Evergreen executed a promissory note to MGA in the amount of $1,200,000.00. The note was secured by a mortgage covering the real estate of Evergreen and improvements thereon. In approximately November of 1977, Evergreen entered into financing arrangements with Casco Bank & Trust Company (Casco) and an agreement was entered into whereby Casco would accept notes in conjunction with the sale of time-share units by Evergreen. As security for the notes, Casco would retain 20% of the sale price in a reserve account and twice a year would release to Evergreen any excess in the reserve account over 20% of the then outstanding loan balances.[5]

To enable Evergreen to market the time-share units, it sought the release of certain property, the Inn and approximately two acres of surrounding land, from the mortgage held by MGA. An agreement was entered into on May 8, 1978 between Evergreen and MGA whereby that property would be released from the mortgage for $300,000, $100,000 cash payment and an assignment of the excess reserves in the reserve accounts held by Casco and Oxford Banks to the extent of $200,000.[6] The promissory note for $1,200,000 was immediately reduced by the $100,000 cash payment. Subsequently, approximately $9,000 has been received by MGA from the excess reserves and applied to reduce the principal balance on the promissory note.

There is approximately $21,500 in excess reserves held by Casco at this time. The

1. The $21,500 which Evergreen seeks to use as cash collateral constitutes only the "excess reserves" held in a reserve account in Casco Bank. The total amount in the reserve account is not indicated by the evidence before the Court.

2. A hearing on the issue of the use of cash collateral received from the sale of timber has been continued.

3. 11 U.S.C. § 363 provides in part:
   (a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the *estate* and an entity other than the estate have an interest. (Emphasis added).

4. An Order for Relief was entered for the debtor under 11 U.S.C. Chapter 11 on April 22, 1982.

5. Similar financing arrangements were made with Oxford Bank and Trust Co. The application to use cash collateral does not, however, seek to use any reserve account funds held by Oxford Bank.

6. Additionally, the agreement provided MGA with a security interest in the balance of the excess reserves over and above the first $200,000 as further security for payment of the mortgage note of November 1, 1976.

excess reserves are a proper subject for use as cash collateral only if the estate has an interest in these funds.[7] The estate would have an interest in these funds only if the assignment of May 8, 1978 was intended to be a security transaction as opposed to an absolute transfer.

It is clear that an assignment may operate to transfer a security interest, rather than absolute ownership, if it is *intended* to create a security interest. Me.Rev.Stat. Ann. tit. 11, § 9–102(1)(a) (1964); *see also id.* § 9–102(2) (a security interest may be created by contract, including assignment). The Uniform Commercial Code itself, as adopted in Maine, furnishes little aid in determining whether a transaction is intended to create a security interest; rather, the determination of whether a particular assignment constitutes a sale (an absolute transfer) or a security transaction is left to the courts. *Id.* § 9–502 U.C.C. Comment 4; *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543, 544 (3rd Cir. 1979). The Code does provide a policy of substance over form, *see* Me.Rev.Stat.Ann. tit. 11, § 9–102(1)(a); *Georgia-Pacific Corp. v. Lumber Products Co.*, 590 P.2d 661 (Okl. 1979), and indicates that the label attached to the transaction by the parties does not control, *see* § 9–102 U.C.C. Comment 1; *see also Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d at 543. The question for the court to decide is whether the true nature of the transaction is such that the "legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale." *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d at 544.

■ In making the determination, the Court is not restricted to an examination of the written agreement. Parol evidence is admissible to show the true nature of a transaction. *See In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937, 940 (2nd Cir. 1973). The Court should examine the parties' conduct, practices, objectives, business activities and relationships. *See Major's Furniture Mart, Inc. v. Castle Credit Corp.; Lyon v. Ty-Wood Corporation*, 212 Pa.Super. 69, 239 A.2d 819 (1968).

■ Several factors have emerged through court interpretation of this section of the U.C.C. which indicate when an assignment operates to create a security interest only. A security interest is indicated where the assignee retains a right to a deficiency on the debt if the assignment does not provide sufficient funds to satisfy the amount of debt. *Major's Furniture Mart, Inc. v. Castle Credit Corp.; In re Bowen*, 5 U.C.C.Rep.Serv. 261 (Bkrtcy.D.Or. 1968). A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source. *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d at 940. Likewise, a security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt. *Gold Coast Leasing Co. v. California Carrots, Inc.*, 93 Cal.App.3d 274, 155 Cal.Rptr. 511 (1979); *see also* § 9–502(2) ("If the security agreement secures an indebtedness, the secured party must account to the debtor for any deficiency."). Evidence that the assignor's debt is not reduced on account of the assignment is also evidence that the assignment is intended as security. *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d at 940 (*citing to Bacon v. Kienzel*, 21 A. 37, 39 (N.J.Ch.1891)). Finally, the contract language itself may express the intent that the assignment is for security only. *See Georgia-Pacific Corp. v. Lumber Products Co.*[8] In contrast, assignments have been found to

---

7. *See* note 3, *supra*.

8. In *Georgia-Pacific Corp.*, the Court found the following language to be indicative of an intent to create a security interest only: the agreement recites a purpose "of securing payment", "the security interest hereby created", "assignor desires to secure the payment", "be applied immediately upon the obligations secured hereby", and "all aspects of the security agreement shall be controlling as to the secured inventory." · Additionally, the contract was entitled "SECURITY AGREEMENT—ACCOUNTS–INVENTORY."

be absolute transfers where the assignment operates to *discharge* the underlying debt. *See Geeslin v. Blackhawk Heating & Plumbing Co., Inc.,* 81 Ill.App.3d 179, 398 N.E.2d 1176 (1979); *Lyon v. Ty-Wood Corporation,* 212 Pa.Super. 69, 239 A.2d 819 (1968).

This Court is persuaded by the evidence that the assignment between Evergreen and MGA was intended to create a security interest. The agreement itself provides that in the event the assigned rights to the excess reserves do not realize $200,-000, Evergreen will be liable to pay the balance. Defendant's Exhibit 1, ¶ 7. Additionally, it appears that MGA acknowledges that its rights to the assigned property would be extinguished were Evergreen to pay the debt in full from some other source.[9] Further, the evidence indicates that the assignment did not operate to immediately discharge the debt. Rather, the balance on the promissory note was reduced only as the money became available to MGA under the agreement. Finally, the agreement itself indicates the intent that the assignment create a security interest. Paragraph 2 provides:

> The assignment made and security given herein is made *as security for* (a) the repayment of a certain promissory note dated November 1, 1976, in the original principal amount of $1,200,000.00 with Evergreen Valley as maker and MGA as payee, and all renewals, extensions and replacements thereof and thereto; (b) the payment and/or performance of any and all other obligations of Evergreen Valley to MGA whether now existing or hereafter arising.

(Emphasis added). Other language indicating intent to create a security interest includes: "In addition to the security herein given . . . ," ¶ 4, "Evergreen Valley will not

make any agreement with any party which would in any way . . . modify the MGA's security as provided hereunder . . . ," ¶ 9, and "Evergreen Valley agrees not to permit or suffer any further assignment or transfer of, nor grant a security interest in any of its rights, credits, or moneys due or to become due under said Repurchase Agreements," ¶ 10.

In summary, the evidence clearly indicates the intent that the assignment create a security interest. Therefore, the excess reserves are "cash collateral" within the meaning of 11 U.S.C. § 363. Since all parties, other than MGA, have consented to the debtor's "Application For Authority To Use Cash Collateral," and MGA has acknowledged that it is adequately protected for the purpose of this application, the application is granted to the extent it permits use of the excess reserves.[10]

---

9. At the hearing, the following discussion took place:

> THE COURT: Now, one further question. If Evergreen Valley paid off the original debt in full what do you maintain Evergreen Valley's rights would be then to the reserve account?
> MR. COLE (attorney for MGA): I would have to say, your Honor, that Evergreen Valley's

right or to answer it a slightly different way, I don't think MGA would claim an interest in it at that point.
Transcript at 41.

10. An Order was entered in this case on September 10, 1982. This Memorandum of Decision constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 752.