**UNITED STATES, Plaintiff,**

v.

**Gary M. POLING, et al., Defendants.**

No. C-2-97-773.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 21, 1999.

Carina J. Campobasso, U.S. Department of Justice, Tax Division, Washington, DC, for U.S.

Thomas F. DeCaro, Jr., Upper Marlboro, MD, for Gary M. Poling, defendant.

Kenneth C. Baker, Toledo, OH, for Fifth Third Bank of NW Ohio, N.A., defendant.

## OPINION AND ORDER

ABEL, United States Magistrate Judge.

The United States of America ("Government") brings this action against Gary M. Poling and Fifth Third Bank of Northwestern Ohio pursuant to 26 U.S.C. §§ 7401 and 7403.[1] This matter is before the Court on the parties' cross-motions for summary judgment (docs.18, 20).

As the result of Poling's failure to pay federal tax liabilities assessed against him, federal tax liens arose and attached to all his property and rights to property. In its motion for summary judgment, the Gov-

ernment contends that the tax liens attached and continue to attach to his right to receive monthly annuity payments from New York Life Insurance Company ("NYLIC"), even though the Bank maintains that Poling assigned this right to it before the tax liens arose. The Government contends that Poling assigned only a security interest to the Bank and that the Bank never perfected its security interest in the annuity payments. Therefore, the Bank has no right to retain the annuity payments because the tax liens have priority over the Bank's interest in these payments.

The Bank contends, however, that the tax liens have not attached to Poling's right to receive the annuity payments because Poling assigned to the Bank all of his rights to the annuity payments before the tax liens arose. Assuming *arguendo* that Poling retained some property interest in the annuity payments, the Bank argues that its interest in the payments is senior to the Government's interest because (1) it is entitled to the protections of 26 U.S.C. § 6323(a) as the "holder of a security interest" because its assigned interest in the annuity payments is protected against the claims of a judgment lien creditor of Poling by Ohio Rev.Code § 3911.10 and (2) Poling's assignment of his right to receive the annuity payments is excluded from the provisions of Article 9 of the Uniform Commercial Code ("UCC").

For the reasons that follow, both motions are denied.

## I. Facts

After working as an insurance agent for NYLIC for over twenty years, Poling became a participant in a benefit plan for NYLIC agents known as Nylic No. 5 ("NYLIC plan"). Pursuant to the NYLIC plan, NYLIC agreed to make monthly annuity payments to Poling from December 1, 1980 until his death.[2] (Government's

---

1. The predecessor in interest of defendant Fifth Third Bank is First National Bank of Findlay, Ohio. Fifth Third Bank and First

National Bank will be collectively referred to as "the Bank."

2. The monthly annuity payment was initially

Mot., Ex. 10.) The monthly income is assignable, but the NYLIC plan provides that "no assignee shall acquire any rights thereto, without written consent" of NYLIC. (Bach Aff., Ex. A, p. 3.) The NYLIC plan does not provide for a cash withdrawal or a cash surrender value.

On November 26, 1980, Poling "assign[ed], transfer[red] and set over" to the Bank "all [his] right, title and interest in and to any monthly income payments" due under the NYLIC plan. (Government's Mot., Ex. 12.) The document evidencing the 1980 Assignment was prepared by NYLIC. It provides in relevant part:

> FOR VALUE RECEIVED, I hereby assign, transfer and set over
> to: First National Bank
> of: Findlay, Ohio
> all of my right, title and interest in and to any monthly income payments now due me and which may hereafter during my lifetime become payable to me from the NEW YORK LIFE INSURANCE COMPANY in accordance with and subject to all the terms, provisions, conditions and rules of the Nylic No. 5 now applicable to me or any Nylic Plan hereafter applicable to me, and subject to any indebtedness which I may owe to said Company now or at any future date.
> I hereby affirm that this assignment is made for a lawful consideration and is not made for the purpose of directly or indirectly evading the anti-rebate laws.
> NEW YORK LIFE INSURANCE COMPANY assumes no responsibility for the validity of this assignment.

(Id.) The document is signed by Poling, a witness, and a general manager who is apparently a representative of NYLIC. The Court will refer to this assignment document as the "1980 Assignment".

Poling testified that the purpose of the 1980 Assignment was to secure a commercial line of credit with the Bank and that he did not intend to assign his entire interest in the annuity payments to the Bank:

$1,574.40 per month, but since July of 1996, it has been reduced to $1,479.90 by NYLIC to

Q. At some point did you come to assign the payments under the NYLIC policy?

A. Yes.

Q. Who did you assign them to?

A. It was First National Bank at that time.

Q. What was the purpose of the assignment?

A. To help cash flow. I mean where I could have access to a line of credit.

Q. So the assignment was security for a loan or a line of credit?

A. For a line of credit.

Q. Could you read it over, Mr. Poling. Do you notice it says that for value received, I hereby assign and transfer and set over to First National Bank of Findlay, Ohio, all my right, title and interest to any monthly income payments now due me, etc.

When you signed this assignment, did you mean to assign the entire interest of your policy forever to the bank?

A. No.

Q. Let me finish my question. To First National Bank?

A. No. That was not the intent at all.

Q. What was the intent?

A. To cover the indebtedness of the line of credit only.

Q. So it was solely to secure the line of credit you were receiving from First National Bank?

A. Absolutely.

(Poling Dep., pp. 6–9.) The original note or written agreement between Poling and the Bank evidencing the establishment of the line of credit has apparently been lost. Except for the period from December of 1992 through May of 1993 when NYLIC suspended payments, the Bank has re-

permit income tax withholdings.

ceived the annuity payments from 1981 through the present. (Bach Aff., ¶ 8.)

On May 23, 1986, Poling refinanced his outstanding debt with the Bank and received new credit in the amount of $136,660.04. (Bach Aff., ¶ 6.) In connection with the refinancing, Poling and his former wife executed a "Commercial Secured Note" in which they agreed to make "59 consecutive monthly payments of $1,574.40 each beginning June 8, 1986 with the balance if any due on May 8, 1991." (Government's Mot., Ex. 13.) They also agreed that the interest rate would be the Bank's base rate plus 1% per annum and that the interest charged would be payable out of the monthly payments. (*Id.*) The Court will refer to this refinancing agreement as the "1986 Agreement".

The 1986 Agreement states that the Polings deposited with the Bank, as "collateral security" for the payment of the principal amount of the note, the following property: the "[a]ssignment of annuity payment (1574.40) from New York Life" and the "[a]ssignment of $150,000 life insurance policy from Gleaner Life Insurance Policy." (Government's Mot., Ex. 13.) Poling testified that the principal amount of the note represented the total amount of money borrowed pursuant to the line of credit:

Q. What was the purpose of this commercial secured note?

A. For business purposes. I don't remember exactly at that time, but it was for business purposes.

Q. At that time, did you receive a principal amount of $136,660.04, as it states on the top left-hand corner?

A. No.

Q. Well, let me ask you this. When you first got your line of credit back in 1981, did you make immediate borrowings?

A. Yes.

Q. Did you keep track of how much you borrowed?

A. And this is a cumulative total in answer to your question, a cumulative total of all the monies that were borrowed over the time period.

Q. As of—

A. The $136,000.

Q. Right, as of May 23, 1986?

A. That's correct.

(Poling Dep., pp. 10–11.)

On June 1, 1990, Poling filed a Chapter 7 bankruptcy petition. (Government's Mot., Ex. 15.) He was granted a discharge on October 15, 1990. Pursuant to the discharge, Poling was relieved of any personal liability for the 1986 Agreement.

On July 9, 1991, Poling and the Bank entered into an "Agreement to Extend Maturity Date of Note". (Bach Aff., ¶ 7.) The Court will refer to this extension agreement as the "1991 Agreement". The 1991 Agreement extends the maturity date of the 1986 Agreement to May 8, 2001, and it provides for the continued assignment of the annuity payments to the Bank until the loan is satisfied or Poling's death, whichever occurs first. (*Id.*, Ex. E.) The 1991 Agreement also states that all terms and conditions of the 1986 Agreement remain in full force and effect except for the assignment of the $150,000 life insurance policy. (*Id.*) Poling testified that it was not his understanding that he assigned his entire right, title and interest in the annuity payments to the Bank:

Q. Now, if you look down to the second whereas clause on the agreement, it says, "Whereas, said Exhibit A [the 1986 Agreement] is secured by an assignment of borrower's right, title and interest in and to monthly income payments in the amount of $1,574.40, and which are guaranteed to him for life, and which assignment shall terminate upon the satisfaction of the loan represented by A or borrower's death, whichever first occurs." Is that statement correct?

A. That's correct.

Q. So, in other words, you didn't assign your entire—

A. At no time—

Q. Right, title and interest?

A. At no time did I ever, under my understanding.

(Poling Dep., pp. 13–14.)

Prior to entering the 1991 Agreement, Poling received a letter from the Bank's attorney, Thomas Drake. In the letter, Drake states:

> As you are aware, Fifth Third is receiving monthly payments in the amount of $1,574.40 from New York Life Insurance Company pursuant to an assignment of an annuity which you made to the bank to secure the payments of a note which you signed on May 23, 1986.
>
> .    .    .    .    .
>
> The maturity date for this loan was May 8, 1991, and while the bank is satisfactorily secured so long as the annuity payments are being made, the bank is going to be forced by the banking regulators to show this loan as a non-performing asset on its books because technically it is now in default. Based on current interest rates, this loan will be paid in full in 7.9167 years. If interest rates go up, the loan will take longer to pay off, and if interest rates go down, the reverse will be true.
>
> The purpose of my letter is to ascertain if you would be willing to enter into an agreement with Fifth Third for the extension of the due date on your loan. By doing so, I want to assure you that you will not in any way be reinstating your personal liability for this loan that was discharged in bankruptcy.

(Government's Mot., Ex. 16.)

On November 28, 1995, the IRS issued a Notice of Levy to the Bank. (Government's Mot., Ex. 24.) The Notice of Levy specified that a levy had attached to the annuity payments received by the Bank on or after October 15, 1990. (Id.) On January 9, 1996, the IRS served a Final Demand on the Bank. (Id., Ex. 25.) On February 12, 1996, the Bank responded to the Final Demand by letter, stating that it had a prior security interest in the annuity payments by virtue of the assignment dated November 26, 1980 and that it did not owe any sums to the taxpayer. (Id., Ex. 26.)

On July 8, 1997, the Government filed this action against Poling and the Bank, seeking to: (1) reduce to judgment outstanding federal tax assessments against Poling; (2) foreclose its federal tax liens on the annuity payments made to the Bank; (3) obtain a judgment against the Bank for tortious conversion of the Government's liens; and (4) obtain a judgment against the Bank for its failure to honor a levy served on it on November 28, 1995.

In an Opinion and Order dated June 3, 1999, the Court rendered judgment in favor of the Government and against Poling in the amount of $158,269.10, plus interest from November 12, 1998. The Court deferred ruling on the Government's claims against the Bank and ordered the parties to submit supplemental briefs addressing the following issues: (1) the applicable state law on assignments; (2) the application of the state law on assignments to the facts underlying the assignment at issue here; (3) whether *Broadcast Music, Inc. v. Hirsch,* 104 F.3d 1163 (9th Cir.1997) is applicable to the facts of this case; and (4) whether Poling has retained any control over the annuity payments, any authority to collect the annuity payments or any power to revoke the assignment to the Bank. Each party has filed two supplemental briefs addressing these issues.

## II. Standard for Summary Judgment

Summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an oth-

erwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. The Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 247–248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *See Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *accord County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–56 (6th Cir.1984), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1985). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *See Adickes,* 398 U.S. at 157–60, 90 S.Ct. 1598; *Smith v. Hudson,* 600 F.2d 60, 65 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on

which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505 (quoting *Schuylkill and Dauphin Imp. Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1871)). As is provided in Fed.R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his ... [pleadings] in opposition to a properly supported motion for summary judgment against him." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 259, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (footnote omitted).

## III. Discussion

Section 6321 of the Internal Revenue Code ("IRC") provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. Under § 6322, the lien generally arises when an assessment is made, and it continues until the taxpayer's liability "is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322; *see also United States v. National Bank of Commerce,* 472 U.S. 713, 719, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). "The statutory language 'all property and rights to property,' appearing in § 6321 ... is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *National Bank of Commerce,* 472 U.S. at 719–20, 105 S.Ct. 2919.

State law controls in determining the nature of the legal interests which a taxpayer may have in property. *See National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. 2919 (citing *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960)). Once it is determined that the taxpayer has rights in property, state law is inoperative, and the tax consequences are dictated by federal law. *Id.* (citing *United States v. Bess,* 357 U.S. 51, 56–57, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958)).

### A. Applicable state law on assignments

Because NYLIC is located in New York and the annuity payments are sent from New York, it is arguable that New York's law on assignments is applicable to the contracts at issue in this case. A federal court applies the choice-of-law rules of the forum state. *See Cole v. Mileti,* 133 F.3d 433, 437 (6th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 42, 142 L.Ed.2d 32 (1998); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws as the governing law for Ohio conflicts issues. *See Cole,* 133 F.3d at 437 (citing *Lewis v. Steinreich,* 73 Ohio St.3d 299, 652 N.E.2d 981, 984 (1995) and *Morgan v. Biro Mfg. Co., Inc.,* 15 Ohio St.3d 339, 474 N.E.2d 286, 288–89 (1984)).

Section 188 of the Restatement (Second) of Conflict of Laws applies to contract disputes where, as here, the parties did not expressly designate the law of a particular jurisdiction to govern any disputes. *See Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818, 820 (6th Cir.1990) (citing *Gries Sports Enterprises v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807, 810 (1984), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985)). Pursuant to sec-

tion 188, the law of the state which has the "most significant relationship" to the contract and the parties is applied to the contract dispute. *Id.* Contacts to be taken into account in determining which state has the most significant relationship to the contract and the parties include the place of contracting, the place of negotiation, the place of performance, the situs of the subject matter, and the domicile of the parties. *Id.*

Both parties contend that the Court need not undertake a conflict of laws analysis because there is no conflict between Ohio's law on assignments and New York's. The Bank relies upon the Ninth Circuit's analysis of New York law in *Broadcast Music, Inc. v. Hirsch,* 104 F.3d 1163 (9th Cir.1997) to argue that New York law requires no particular form for an assignment and that "an assignment occurs only when the assignor retains no control over the funds, no authority to collect and no power to revoke." 104 F.3d at 1167. Relying upon *State ex rel. Leach v. Price,* 168 Ohio St. 499, 156 N.E.2d 316, 320 (1959), the Bank contends that Ohio law, like New York law, requires no particular form for an assignment and that Ohio law also defines an assignment as a transfer of property from one person to another which, unless qualified in some way, transfers a person's entire interest in the assigned property with no retained control, authority or power over the assigned property. *See* 156 N.E.2d at 316.

The Government agrees with the Bank's contention that there is no conflict between Ohio's law on assignments and New York's. The Government also accepts the Bank's definition of an assignment under Ohio law. Because the parties agree that there is no conflict between Ohio's law on assignments and New York's and the Court has not found any cases indicating otherwise, the Court will refer to both Ohio's and New York's law on assignments in discussing whether the parties intended an absolute assignment or a security interest. *See Carbonic Products Co. v. Welding & Cutting Supply Co.,* No. 86–1730, 1987 WL 38061, at *2 (6th Cir. July 17,

1987) (declining to decide whether Michigan or Ohio law should have been applied because Michigan and Ohio law were the same with respect to the issues presented) (citing *Keene Corp. v. Insurance Company of North America,* 667 F.2d 1034, 1041 n. 10 (D.C.Cir.1981)); *see also Lucker Manufacturing v. Home Ins. Co.,* 23 F.3d 808, 813 (3d Cir.1994) (referring to laws of both Wisconsin and Pennsylvania because outcome of lawsuit was the same under either state's law); *FDIC v. Massingill,* 24 F.3d 768, 775 (5th Cir.1994) (where there is no difference between the laws of the forum state and another state, a court need not decide the choice of law issue).

## B. Whether Poling assigned to the Bank all of his rights to the annuity payments.

A federal tax lien arose and attached to all Poling's "property and rights to property" on November 20, 1989. The Government contends that Poling's property and rights to property included his right to receive the monthly annuity payments under the NYLIC plan. The Bank contends, however, that the federal tax liens did not attach to Poling's right to receive the annuity payments because he had no property interest in the annuity payments on November 20, 1989 or at any time thereafter. According to the Bank, after assigning his right to receive the annuity payments to the Bank on November 26, 1980, Poling had no further interest in the annuity payments to which a federal tax lien could attach.

In order to determine to what extent Poling has property or rights to property to which a tax lien can attach, the Court must decide whether Poling has assigned to the Bank all of his interest in the annuity payments or whether he has transferred a security interest. The Government argues that the Court must examine the 1986 Agreement between Poling and the Bank, and not the 1980 Assignment, in order to determine Poling's interest in the annuity payments. According to the Government,

the 1980 Assignment does not govern Poling's interest in the annuity payments because (1) it was prepared by NYLIC and uses boiler-plate language likely used in all assignments of annuity policies issued by NYLIC and (2) it does not constitute the contract between the parties in interest, Poling and the Bank.

The Government next argues that the 1986 Agreement did not constitute an absolute assignment of Poling's interest in the annuity payments. Rather, it merely created a security interest in favor of the Bank. According to the Government, the 1986 Agreement indicates that the parties intended that there be an assignment of a security interest and not an ownership interest because (1) it provides that the annuity policy was deposited with the Bank as "collateral security" for the Commercial Secured Note and (2) it does not provide that the annuity policy would become the absolute property of the Bank.

In response to the Government's arguments, the Bank argues that the parties' intent when the 1980 Assignment was executed and delivered to NYLIC is controlling here and that the parties' intent was to give the Bank the right to receive all future annuity payments. The Bank maintains that the clear language of the 1980 Assignment reveals that Poling transferred his entire right, title and interest in the annuity payments in order to satisfy his financial obligations to the Bank. The Bank also argues that there is nothing in the 1986 Agreement which created or referred to a security interest, and there is nothing which changed Poling's previous assignment of his entire interest into a security interest.

In support of its argument that the 1980 Assignment resulted in the absolute assignment of Poling's interest in the annuity payments, the Bank relies upon the Ninth Circuit's reasoning in *Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163 (9th Cir.1997), in which the court addressed the issue of whether a federal tax lien took priority over prior unrecorded assignments of a taxpayer's rights to receive royalty income from the performance of a copyrighted work.

In *Hirsch*, Ronald Miller was a songwriter to whom Broadcast Music, Inc. ("BMI") paid royalties derived from his compositions. To satisfy debts Miller owed two creditors, he executed assignments to them of future royalties and directed BMI to pay the creditors directly. Before the debts were satisfied, the IRS assessed deficiencies against Miller and recorded notices of tax liens against his royalty income. The IRS served BMI with notices of levy, and BMI filed an interpleader action to resolve the conflicting claims to Miller's royalty income.

After deciding that Miller's assignment of future royalties to the creditors was not subject to the recording rules of the Copyright Act, 17 U.S.C. § 101, *et seq.*, the court examined whether, under New York law, the instruments executed by Miller in favor of the creditors "transferred all of his rights to the future royalties he purported to assign (*i.e.*, whether Miller had anything left to which the liens could attach)." *Hirsch*, 104 F.3d at 1165. In support of its argument that Miller did not transfer all of his rights, the government maintained that an agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment because the assignor retains control over the subject matter.

The court rejected the government's argument because Miller did not control the royalty payments after executing the assignments and, in those assignments, he expressly waived his right to terminate his agreement with BMI until his loans were repaid. Thus, although Miller retained a residual interest in the excess royalty income over the amounts assigned, the court found that the assignments constituted irrevocable instructions to pay the specified sums directly to the creditors as royalties came into BMI's hands and that Miller had no control whatsoever over the amounts he had assigned. *Id.*

The government also argued that the assignments merely transferred security interests that were never perfected. After noting that it must look to the substance of the transaction rather than its form, the court concluded that Miller made complete assignments of the monies specified in the assignment documents, leaving him without a current vested interest. *Id.* at 1167–68. Because the assignments were complete under New York law, they transferred Miller's interests to the creditors before the federal tax liens could attach. *Id.* at 1168. Therefore, Miller's creditors, and not the government, had a right to the copyright royalties.

The Bank argues that the facts of *Hirsch* parallel the facts of this case in four critical aspects. First, in *Hirsch,* Miller did not control the royalty payments after executing the assignments. Here, except for a brief period when NYLIC suspended the payments, the Bank has been the sole recipient of the annuity payments for 19 years. Second, in *Hirsch,* Miller expressly waived his right to terminate the assignment until his loans were repaid. Referring to the 1986 Agreement, the Bank maintains that Poling has also agreed to assign his interest in the annuity payments until his loan is fully satisfied. Third, although Miller possessed a residual interest in the funds remaining after his loans were repaid, he retained no control whatsoever over the amounts necessary to repay his loans. Again referring to the 1986 Agreement, the Bank maintains that although Poling may have a residual interest in the annuity payments after his loan is fully satisfied, he does not have a current vested interest in the annuity payments. Finally, the Bank maintains that Poling, like Miller, possesses no authority to collect the annuity payments or to revoke the assignment.

The Government maintains that the facts of *Hirsch* do not apply to the facts of this case. The Government argues that, unlike the assignments executed by Miller, Poling did not expressly waive his right to terminate his agreement with NYLIC until his debt to the Bank was repaid. The

1980 Assignment was signed by Poling only as a unilateral statement of intention, and there is no indication that Poling could not revoke the assignment at any time.

The Government further argues that the parties' intent when the 1980 Assignment was executed and delivered to NYLIC must be examined. Poling has testified that the purpose of the 1980 Assignment was to secure a commercial line of credit and that he did not intend to assign his entire interest in the annuity payments to the Bank. The Bank, however, has not offered any evidence showing that its intention was to take an ownership, rather than a security, interest in the annuity payments.

The Government also directs the Court's attention to *In re Willowood East Apartments of Indianapolis II, Ltd.,* 114 B.R. 138 (Bankr.S.D.Ohio 1990), *In re Nat'l Equipment & Mold Corp.,* 64 B.R. 239 (Bankr.N.D.Ohio 1986), and *United States v. Talco Contractors, Inc.,* 93–CV–6389T, 1999 WL 500989 (W.D.N.Y. May 7, 1999). In *Willowood,* the debtor's obligations under a promissory note were secured by a mortgage and an assignment of rents. The assignment of rents provided, in pertinent part:

> As part of the consideration for the indebtedness evidenced by the Note, Borrower hereby absolutely and unconditionally assigns and transfers to Lender all the rents and revenues, including all security deposits, of the Project[.]
>
> .    .    .    .    .
>
> Borrower hereby authorizes Lender or Lender's agents to collect the aforesaid rents and revenues and hereby directs each tenant of the Project to pay such rents to Lender or Lender's agents … it being intended by Borrower and Lender that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only.
>
> .    .    .    .    .

This assignment of rents shall terminate at such time as this Instrument ceases to secure indebtedness held by Lender.

*Willowood,* 114 B.R. at 140–41. Applying Indiana's law on assignments, the court held that the lender's interest in the rentals was not an absolute transfer of ownership because (1) the right to collect the rents reverted back to the debtor once the debtor's financial obligations under the note were repaid and (2) the parties treated the transaction as a loan with a grant of a security interest. *Id.* at 141–42. The Government contends that the holding in *Willowood* applies here because it contends that the Bank would not be entitled to continue receiving the annuity payments if Poling decided to pay off his loan early.

In *National Equipment & Mold Corporation,* the debtor assigned to the bank an interest in its accounts receivable in exchange for a loan in the amount of $250,000. The agreement between the parties provided in relevant part:

> The undersigned agrees, until payment of all indebtedness and of liability of every kind of the undersigned to the Bank ... to make collection of the said Receivable as agent for the Bank, and remit the proceeds thereof forthwith to the Bank.

> The proceeds of all collections of the Receivables shall be the absolute property of the Bank, and they shall not be deposited or mingled with any other moneys or funds of the undersigned.

64 B.R. at 241. After the debtor filed a Chapter 11 bankruptcy petition, the issue arose as to whether the agreement transferred ownership of the accounts receivable or merely created a security interest. Although the agreement did not use language which is customarily employed in a conveyance of title, the court found that the parties intended for the debtor to convey ownership of its accounts receivable to the bank. *Id.* at 245. The Government contends that *National Equipment & Mold Corporation* applies to the instant dispute because unlike the agreement between the debtor and the bank, the 1986

Agreement does not provide that the annuity policy would become the "absolute property" of the Bank. Rather, it provides that the Bank would have to purchase the annuity policy at a sale in order to become the owner.

In *Talco,* a tax dispute between the government and Talco was settled, and the court retained jurisdiction to enforce the terms of the settlement agreement. The agreement provided that Talco would pay the government the first $400,000 of the proceeds of a condemnation suit Talco had brought against the State of New York, and it would pay the government an additional 50% of any damages award after payment of reasonable attorney fees and litigation expenses.

Prior to entering into the agreement with the government, Talco had made an assignment of the proceeds of the suit to Chase Manhattan Bank in the amount of $124,000. Kendamar Corporation ultimately became the holder of this assignment, which provided in pertinent part: "[f]or value received, ... Talco ... hereby grants a security interest in and assigns, transfers and sets over unto Chase ... all of Assignor's right, title and interest in a certain claim of the Assignor ... and all proceeds of the foregoing." *Talco,* slip op. at 4–5, 1999 WL 500989. The assignment also provided that it was "made by Assignor as collateral and security for any and all liabilities of Assignor to Bank" and that "[i]f the Condemnation Claim exceed[ed] the Liabilities, Bank [would] refund the difference to the Assignor." *Id.* at 5, 1999 WL 500989. A letter from a Chase vice president indicated that Talco assigned its right, title and interest in the proceeds as "collateral security" for its obligations to Chase. *Id.*

Applying New York law, the court held that it was clear that the parties' intent was that the assignment was for collateral/security purposes and not an outright assignment. *Id.* at 6. Because Chase did not properly perfect its security interest, the court ruled that Kendamar, as succes-

sor in interest to Chase, held an unperfected security interest and that the government's lien had priority over Kendamar's interest. *Id.*

The government contends that *Talco* applies to the facts of this case because the only document reflecting the agreement between the Bank and Poling (the 1986 Agreement) unambiguously shows the parties' intent to be that the Bank was to have a security interest in the annuity payments. The Bank contends that the facts of *Talco* are not at all similar to those present in this case because no portion of the proceeds were ever paid out to Chase and it is unclear whether Talco ever directed the proceeds to be paid directly to Chase. Moreover, the Bank maintains that the *Talco* decision is devoid of reference to any case law and contains no substantive discussion of New York's law on assignments.

The parties have agreed that an "assignment" is a transfer of property from one person to another which, unless qualified in some way, transfers a person's entire interest in the assigned property with no retained control, authority or power over the assigned property. Article 9 of the UCC, which has been adopted both in Ohio and in New York, applies "[t]o any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts." Ohio Rev.Code § 1309.02(A)(1). Pursuant to Article 9, a "security interest" is defined as "an interest in personal property or fixtures that secures payment or performance of an obligation." Ohio Rev.Code § 1301.01(KK)(1).

"It is a long-standing rule that 'courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen.'" *In re Hurricane Elkhorn Coal Corp.*, 19 B.R. 609, 616 (Bankr. W.D.Ky.1982) (quoting 1 Gilmore, Security Interests in Personal Property § 2.6, at 47

(1965)); *see also Hirsch,* 104 F.3d at 1167 (court must look to substance of transaction rather than form of contract); *Columbus Motor Car Co. v. Textile–Tech, Inc.,* 68 Ohio Misc. 25, 428 N.E.2d 882, 885 (Franklin Cty.Mun.Ct.1981) (same). The "absolute" nature of an assignment does not preclude its service as a security agreement. *See In re Navigation Technology Corp.,* 880 F.2d 1491, 1493 (1st Cir.1989).

In deciding whether the 1980 Assignment and/or 1986 Agreement resulted in an absolute assignment of Poling's interest in the annuity payments or merely created a security interest in favor of the Bank, the Court must examine the intent of the parties. *See Goldstein v. Madison Nat'l Bank of Washington, D.C.,* 89 B.R. 274, 276 (D.D.C.1988); *Nat'l Equipment & Mold Corp.,* 64 B.R. at 245. This intent is to be discerned from the contents of the documents at issue, the testimony of the contracting parties, the circumstances surrounding the transaction and the parties' conduct, practices, objectives, business activities and relationships. *See Goldstein,* 89 B.R. at 276; *In re Tyson Metal Products, Inc.,* 117 B.R. 181, 184 (Bankr. W.D.Pa.1990); *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659, 661 (Bankr.D.Me. 1982).

■ There are several factors which indicate when an assignment operates to create a security interest instead of an absolute assignment: (1) the assignment is delivered simultaneously with the loan, *see In re Joseph Kanner Hat Co.,* 482 F.2d 937, 940 (2d Cir.1973); *Hurricane Elkhorn,* 19 B.R. at 616–17; (2) the payments received are used to reduce the outstanding balance, *id.;* (3) any payments received pursuant to the assignment and exceeding the loan are returned to the assignor, *id.;* (4) the assignee retains a right to a deficiency on the debt if the assignment does not provide sufficient funds to satisfy the amount of debt, *see Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538, 545 (3d Cir.1979); (5) the assignee acknowledges that his rights in the as-

signed property would be extinguished if the debt owed were to be paid through some other source, *see Joseph Kanner*, 482 F.2d at 940; and (6) the bank treats the assignment as a method of payment of the loan. *Id.* Assignments have been found to be absolute transfers where the assignment operates to discharge the underlying debt. *See Evergreen Valley Resort*, 23 B.R. at 661–62.

█ Applying these factors here, the Court concludes that whether Poling's assignment was absolute or intended as security presents a triable issue of fact which cannot be disposed of by summary judgment. *See In Matter of Candy Lane Corp.*, 38 B.R. 571, 577 (Bankr.S.D.N.Y. 1984); *Major's Furniture Mart*, 602 F.2d at 543. The language used in the 1980 Assignment supports a finding that Poling's assignment was absolute and not one for security because it states that he "assign[ed], transfer[red] and set over" to the Bank "all [his] right, title and interest in and to any monthly income payments" due under the NYLIC plan. The following facts, however, weigh in favor of a finding that Poling assigned merely a security interest to the Bank: (1) the 1980 Assignment was delivered in exchange for a commercial line of credit for which Poling undertook an obligation to repay; (2) Poling testified that the purpose of the 1980 Assignment was to secure the line of credit and that he did not intend to assign his entire interest in the annuity payments to the Bank; and (3) the payments received were applied to reduce the outstanding balance of the line of credit. It is unclear whether Poling could have or did make payments on the line of credit through other sources, whether the Bank's rights in the annuity payments would have been extinguished prior to the 1986 Agreement if Poling had paid his debt through some other source, or whether Poling could

have revoked the assignment and collected the annuity payments himself. The Court also notes that there is some uncertainty as to how the transaction between Poling and the Bank was structured because NYLIC prepared the 1980 Assignment and the original note or written agreement between Poling and the Bank evidencing the establishment of the line of credit has apparently been lost.

The fact that the 1986 Agreement refers to the annuity payments as "collateral security" for a loan supports a finding that Poling assigned merely a security interest to the Bank. Moreover, the fact that the 1986 Agreement did not operate to discharge the amount owed by Poling, *i.e.*, the Bank retained a right to a deficiency on the loan if the annuity payments did not provide sufficient funds to satisfy the amount of the loan by May 8, 1991, further supports such a finding. On the other hand, the following facts weigh in favor of a finding that Poling's assignment was absolute and not one for security: (1) the annuity payments have been sent directly to the Bank since 1981; (2) despite the 1986 Agreement's reference to the annuity payments as "collateral security", no event of default triggered the Bank's receipt of the annuity payments; (3) the loan payment schedule matches the amount of the annuity payments; and (4) there is no evidence that Poling has made any payments on the loan through any other source besides the annuity. The Court also notes that the 1991 Agreement makes clear that the assignment terminates once the loan is paid in full, a fact which could support either a finding of an absolute assignment or a security interest.[3] Based upon the foregoing, the Court concludes that a finder of fact could conclude either that the assignment was absolute or that it

**3.** The courts in *Joseph Kanner* and *Hurricane Elkhorn* viewed this fact as supporting the conclusion that the parties intended a security interest. The court in *Hirsch*, however, found that an absolute assignment was intended even though the debtor retained a residual interest in the excess royalty income over the amounts assigned. The court reasoned that an absolute assignment was intended because the debtor had no control whatsoever over the amounts he had assigned.

created a security interest in favor of the Bank.

## C. Whether the Bank is the "holder of a security interest"

In addition to arguing that Poling assigned all of his rights to the annuity payments, the Bank argues that even if Poling transferred only a security interest in the annuity payments, it is entitled to the protections of 26 U.S.C. § 6323(a) because it is the "holder of a security interest". Section 6323 of the Internal Revenue Code provides that liens arising under § 6321 are not valid as against "any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed[.]" 26 U.S.C. § 6323(a).

The Government argues that the Bank is not entitled to this priority because the Bank's interest in the annuity payments has never been perfected as required by § 6323(h)(1), which provides that a security interest must have, among other requirements, "become protected under local law against a subsequent judgment lien arising out of an unsecured obligation." 26 U.S.C. § 6323(h)(1)(A). According to the Government, to perfect its interest under Ohio law, the Bank needed to file a financing statement pursuant to Ohio Rev. Code § 1309.21 because an annuity contract is a "general intangible" under Article 9.[4] Because the Bank never filed a financing statement, it never perfected its security interest in the annuity payments under Ohio law; therefore, it is not entitled to the protections of § 6323.

The Bank does not contend that it filed a financing statement. Rather, the Bank argues that it was not required to file a financing statement to meet the requirements of 26 U.S.C. § 6323(h)(1)(A). According to the Bank, its security interest is protected against the claims of a judgment

lien creditor of Poling by the provisions of Ohio Rev.Code § 3911.10. The Bank maintains that Ohio Rev.Code § 3911.10, which requires no filing of a financing statement, excepts the annuity payments from the claims of Poling's creditors by providing that:

> All ... annuities upon the life of any person, or any interest therein, which may hereafter mature and which have been taken out for the benefit of, or made payable by change of beneficiary, transfer, or assignment to, ... any creditor ... shall be held, together with the proceeds or avails of such contracts, subject to a change of beneficiary if desired, free from all claims of the creditors of such insured person or annuitant.

Ohio Rev.Code § 3911.10. Because its interest in the annuity payments is protected against the claims of a judgment lien creditor by § 3911.10, the Bank argues that its interest qualifies as a security interest under 26 U.S.C. § 6323(h)(1). Therefore, the Bank contends that it is entitled to the protections of § 6323(a) because it is the "holder of a security interest".

In the alternative, the Bank argues that it is the "holder of a security interest" because the filing requirements of Article 9 do not apply to a person's transfer of his rights to receive annuity payments. Without citing any case law, the Bank argues that Ohio Rev.Code §§ 1309.04(E) and (F) exclude the assignment from the provisions of Article 9. Ohio Rev.Code § 1309.04(E) excludes "a transfer of a single account to an assignee in whole or partial satisfaction of a pre-existing indebtedness." Ohio Rev.Code § 1309.04(F) excludes "a transfer of an interest or claim in or under any policy of insurance[.]"

The Government contends that the Bank's arguments are without merit. With regard to the Bank's reliance on § 3911.10, the Government maintains that

---

**4.** The Government relies upon *In the Matter of Newman,* 993 F.2d 90, 95 (5th Cir.1993) (finding that an annuity contract is a general intangible) and *In re Hayes,* 168 B.R. 717, 727

n. 36 (Bankr.D.Kan.1994) (noting that debtor's right to receive annuity payments logically falls within the class of general intangibles) for this proposition of law.

"[i]t is black letter law that state-law limitations on the ability of general creditors to reach certain types of property of a taxpayer have no effect on the attachment of federal tax liens." (Government's Br. in Opp'n, doc. 21, p. 4) (citing *Bank One Ohio Trust Co., N.A. v. United States*, 80 F.3d 173, 175 (6th Cir.1996)). Therefore, any protection that Ohio may give an assignment for security against state law creditors is irrelevant where a federal tax lien is involved. With regard to the Bank's reliance on §§ 1309.04(E) and (F), the Government contends that the annuity payments at issue are not properly defined as either an "account" or a "policy of insurance."

■ Assuming *arguendo* that the Bank holds a security interest in the annuity payments, the Court concludes that Ohio Rev.Code §§ 1309.04(E) and (F) do not exclude the Bank from the provisions of Article 9. First, § 1309.04(E) does not apply because the right to receive the annuity payments is not an account, which is defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." *See* Ohio Rev. Code § 1309.01(A)(15) and Commentary (stating that an account is the "ordinary commercial account receivable" and that in some cases a right to receive money "crystallizes not into an account but into a general intangible, for it is a right to payment of money that is not for goods sold or leased or for services rendered"); *see also In re Hayes*, 168 B.R. at 727 n. 36 (finding that the right to receive annuity payments was not an account because an account is defined in terms of "good sold or leased or for services rendered").

■ Second, § 1309.04(F) does not apply because the NYLIC plan is not a policy of insurance. "An annuity contract is not necessarily a life insurance policy simply because a life insurance company issued it." *In re Vinzant*, 108 B.R. 752, 757 (Bankr.D.Kan.1989). The Supreme Court of Ohio has stated:

[T]he ordinary annuity contract and the ordinary contract of life insurance are different in essential respects. The former is distinguishable from the latter in that a life insurance contract constitutes an agreement to pay a specified sum of money on the death of the insured or on his reaching a certain age, whereas an annuity contract is one in which there is an agreement to pay a certain sum to the annuitant annually during life or for a given number of years.

*Bronson v. Glander*, 149 Ohio St. 57, 59, 77 N.E.2d 471 (1948). Because the NYLIC plan is an agreement to pay a certain sum to Poling during his life rather than an agreement to pay a specified sum of money upon his death, the Court finds that the NYLIC plan is not a policy of insurance.

The Court further concludes that, assuming *arguendo* that the Bank holds a security interest in the annuity payments, the Bank's interest in the annuity payments is not protected against the claims of a judgment lien creditor by Ohio Rev. Code § 3911.10; therefore, it is not entitled to the protections of 26 U.S.C. § 6323(a) because it is not the "holder of a security interest." Because the annuity was not taken out for the Bank's benefit, the Bank must show that the annuity has been "made payable by change of beneficiary, transfer, or assignment to" it. Although there is no Ohio case law interpreting this phrase, a plain reading of the statute and the fact that Ohio's version of Article 9 does not incorporate or refer to § 3911.10 leads the Court to the conclusion that the phrase refers to an absolute assignment, and not an assignment of a security interest. Because the issue of whether Poling's assignment was absolute or intended as security is a triable issue of fact, the Court cannot find that the Bank's interest in the annuity payments is protected against the claims of a judgment lien creditor of Poling by the provisions of Ohio Rev.Code § 3911.10.

Assuming *arguendo* that the Bank holds a security interest in the annuity pay-

ments, the Court concludes that the Bank is not a "holder of a security interest" as set forth in 26 U.S.C. §§ 6323(a) and (h) because: (1) it did not perfect its security interest by filing a financing statement as required by Ohio Rev.Code § 1309.21; (2) Ohio Rev.Code §§ 1309.04(E) and (F) do not exclude the Bank from the provisions of Article 9; and (3) the Bank's interest in the annuity payments is not protected against the claims of a judgment lien creditor by Ohio Rev.Code § 3911.10.

## IV. Conclusion

For the above stated reasons, the Court **DENIES** the Government's motion for summary judgment with respect to its claims against the Bank (doc. 18) and **DENIES** the Bank's motion for summary judgment (doc. 20).